## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

O.E.M. GLASS NETWORK, INC. and
BROOKLYN WHOLESALE GLASS INC.,

      Plaintiffs,

      v.

MYGRANT GLASS COMPANY, INC.,
INTERSTATE GLASS OF AMITYVILLE
NY, LLC., METRO GLASS
DISTRIBUTING, INC., XINYI AUTO
GLASS NORTH AMERICA CORP.,
VITRO, S.A.B. de C.V., VITRO
AUTOMOTIVE GLASS LLC, VITRO
AUTOMOTRIZ S.A. de C.V., FUYAO
GLASS AMERICA INC., AUTO TEMP
INC., and SIKA CORPORATION

**AMENDED COMPLAINT**

Civil Action No. 1:19-cv-00742

      Plaintiffs O.E.M. Glass Network, Inc. and Brooklyn Wholesale Glass Inc. (collectively referred to as "OEMGN"), by and through their attorneys, Constantine Cannon LLP, allege for their Complaint against defendants Mygrant Glass Company, Inc. ("Mygrant"), Interstate Glass of Amityville NY, LLC, Metro Glass Distributing, Inc. (Interstate Glass of Amityville NY, LLC and Metro Glass Distributing, Inc. are collectively referred to as "Interstate" or the "Interstate Defendants"), Xinyi Auto Glass North America Corp. ("Xinyi"), Vitro, S.A.B. de C.V., Vitro Automotive Glass LLC, and Vitro Automotriz, S.A. de C.V. (Vitro, S.A.B. de C.V., Vitro Automotive Glass LLC, and Vitro Automotriz, S.A. de C.V. are collectively referred to as "Vitro" or the "Vitro Defendants"), Fuyao Glass America Inc. ("Fuyao"), Auto Temp Inc. ("ATI"), and Sika Corporation ("Sika") (Xinyi, Vitro, Fuyao, ATI, and Sika are collectively referred to as the "Manufacturer Defendants"), upon knowledge as to themselves and their own actions and upon information and belief as to all other matters alleged below, as follows:

**NATURE OF THE ACTION**

1.      This case concerns an illegal conspiracy among Defendants to eliminate OEMGN, a wholesaler of aftermarket auto glass, by orchestrating a group boycott among OEMGN's competitors and suppliers.  To effectuate this scheme, Defendants Mygrant and Interstate – two of OEMGN's competitors – abused their market heft to convince OEMGN's suppliers, the Manufacturer Defendants, to agree to cut off product sales to OEMGN, refuse further dealings with it, and take measures to preclude OEMGN from obtaining these manufacturers' products through alternative channels.  Defendants' conduct amounts to one of the most pernicious violations of antitrust law: a *per se* illegal group boycott in the mold of *Fashion Originators' Guild of America, Inc. v. Federal Trade Commission* and its progeny.

2.      OEMGN is an aftermarket auto glass wholesaler. OEMGN purchases aftermarket auto glass products from manufacturers and sells the products to retail customers in the New York Metropolitan Area.  OEMGN differentiates itself from its competitors, including Defendants Mygrant and Interstate, by offering retailers competitively low prices, particularly on more expensive aftermarket auto glass products.  This ultimately results in lower prices to consumers.  It also presents a disruptive threat to entrenched wholesalers like Mygrant, which is the largest independent aftermarket auto glass wholesaler in the nation, and Interstate.

3.      To suppress the competitive threat posed by OEMGN, Defendants have conspired to put it out of business.  Mygrant and Interstate have vowed to discontinue purchasing from auto glass and urethane manufacturers that continue to deal with OEMGN.  Because Mygrant and Interstate's combined multi-million-dollar purchases far exceed OEMGN's purchases, each Manufacturer Defendant has agreed to join the conspiracy.

4.      Defendants' scheme has been successful.  Because of Defendants' illegal acts,

OEMGN has been unable to purchase the aftermarket auto glass products needed to maintain a sufficiently voluminous and diverse stock to compete viably.  Accordingly, OEMGN has lost substantial business.  Defendants' misconduct has not only harmed OEMGN, it has also harmed competition, including by inflating the prices for aftermarket auto glass products paid by retailers and consumers, and reducing output.

5.     Defendants' conspiracy is the worst-kept secret in the industry.  The Manufacturer Defendants – as well as other industry participants – have repeatedly told OEMGN, *point blank*, that they would no longer sell products to OEMGN due to the pressure exerted by Mygrant and Interstate.  Defendant Sika told OEMGN that Mygrant had "strong-armed" Sika and that Mygrant would "flatten anybody" that supplied OEMGN.  A large aftermarket auto glass wholesaler, American Glass Distributors, told OEMGN that at the behest of Mygrant and Interstate, "we in the industry are all supposed to unite to . . . keep you out of the business."  Defendant Vitro told OEMGN that a high-level employee at Mygrant told Vitro "not to sell" to OEMGN, and Vitro complied.  Touting the success of the boycott, Interstate's owner, Angelo Marino, openly characterized OEMGN as a "cancer" because suppliers were refusing to sell to it.  Through these explicit statements and others detailed herein, Defendants have openly admitted to boycotting OEMGN.

6.     Defendants' conduct amounts to violations of the Sherman Act, violations of New York's Donnelly Act, and tortious interference with OEMGN's prospective business relations.  OEMGN brings this suit to remedy the catastrophic financial harm it has sustained because of Defendants' conduct.

## JURISDICTION AND VENUE

7.     Among other statutes, this Complaint is filed under Section 4 of the Clayton Act (15 U.S.C. § 15) to remedy violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and seeks trebled damages, costs of suit, interest, and attorneys' fees.

8.     This Court has subject matter jurisdiction over the federal antitrust law claims alleged herein under 15 U.S.C. § 15, and 28 U.S.C. §§ 1331, 1337.

9.     OEMGN also brings this action under state law for tortious interference with prospective business relations, and for violations of New York General Business Law § 340 et seq. (the Donnelly Act).  The Court has jurisdiction over OEMGN's state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Defendant Mygrant because Mygrant transacts business and is found in this district and others.  Moreover, the acts complained of herein have had and will have substantial effects in New York.

11.     This Court has personal jurisdiction over the Interstate Defendants because they are organized under the laws of the State of New York, located in this district, and transact business in the State of New York.  The acts complained of herein have had and will have substantial effects in New York.

12.     This Court has personal jurisdiction over Defendant Xinyi because Xinyi transacts business and is found in this district and others.  Moreover, the acts complained of herein have had and will have substantial effects in New York.

13.     This Court has personal jurisdiction over the Vitro Defendants because they transact business and are found in this district and others.  Moreover, the acts complained of herein have had and will have substantial effects in New York.

4

14.     This Court has personal jurisdiction over Defendant Fuyao because Fuyao transacts business and is found in this district and others.  Moreover, the acts complained of herein have had and will have substantial effects in New York.

15.     This Court has personal jurisdiction over Defendant ATI because ATI transacts business and is found in this district and others.  Moreover, the acts complained of herein have had and will have substantial effects in New York.

16.     This Court has personal jurisdiction over Defendant Sika because Sika transacts business and is found in this district and others.  Moreover, the acts complained of herein have had and will have substantial effects in New York.

17.     The district is the proper venue under 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391 because (i) a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district; and (ii) the acts complained of herein have had and will continue to have substantial anticompetitive effects in this district.

**PARTIES**

18.     Plaintiff O.E.M. Glass Network, Inc. is a corporation organized under the laws of the State of New Jersey.  O.E.M. Glass Network, Inc. operates in connection with Plaintiff Brooklyn Wholesale Glass Inc., a corporation organized under the law of the State of New York, located in Brooklyn, New York.  O.E.M. Glass Network, Inc. and Brooklyn Wholesale Glass Inc. share common ownership, and are collectively referred to herein as "OEMGN."

19.     Through O.E.M. Glass Network, Inc., OEMGN purchases aftermarket auto glass in bulk from auto glass manufacturers. OEMGN stores the glass it purchases at its warehouse in Brooklyn, New York.  Through Brooklyn Wholesale Glass Inc., OEMGN sells and ships glass to its retail customers in the New York Metropolitan Area, including in Brooklyn, Staten Island,

Manhattan, Queens, and New Jersey.

20.     Since opening for business in late 2013, OEMGN has distinguished itself from competing wholesalers by offering retailers high-quality aftermarket auto glass, with fast delivery (often within one-to-two hours of receiving an order), at prices below OEMGN's competitors.  Interstate's owner, Angelo Marino, has expressly characterized OEMGN as a "price-cutter."

21.     Defendant Mygrant is a California corporation, with its principal place of business in Hayward, California.

22.     Mygrant is the largest independent aftermarket auto glass wholesaler in the United States.  It owns and operates approximately 70 aftermarket auto glass warehouses nationwide, including warehouses in Brooklyn, New York; Bronx, New York; and Bellville, New Jersey.  Each of these three warehouses is in the New York Metropolitan Area. Throughout the relevant time period, Mygrant's aftermarket auto glass product sales have totaled hundreds of millions of dollars per year.

23.     Defendant Interstate Glass of Amityville NY, LLC is a New York limited liability company located in Copiague, New York.  Defendant Metro Glass Distributing, Inc. is a New York corporation located in Ridgewood, New York.  Interstate Glass of Amityville NY, LLC and Metro Glass Distributing, Inc. are collectively referred to herein as "Interstate" or the "Interstate Defendants."  The Interstate Defendants are owned by Angelo Marino.  Interstate owns and operates two aftermarket auto glass warehouses in the New York Metropolitan Area – one on Long Island and one in Maspeth, Queens.

24.     Defendant Xinyi is a corporation organized under the laws of Ontario, Canada with its principal place of business located in Ontario, Canada.  Xinyi a leading manufacturer of

aftermarket auto glass and sells aftermarket auto glass products to wholesalers throughout the United States.

25.    Defendant Vitro, S.A.B. de C.V. is a corporation organized under the laws of Mexico with its principal place of business located in Nuevo León, Mexico.  Defendant Vitro Automotive Glass LLC, a subsidiary of Vitro, S.A.B. de C.V., is a limited liability company organized under the laws of, and domiciled in, the state of Delaware.  Defendant Vitro Automotriz, S.A. de C.V., also a subsidiary of Vitro, S.A.B de C.V., is a corporation organized under the laws of Mexico with its principal place of business located in Garcia, N.L. Mexico. The three companies are  collectively referred to herein as "Vitro" or the "Vitro Defendants." Vitro is a leading  manufacturer of aftermarket auto glass and sells aftermarket auto glass products in wholesalers  throughout the United States.  In or about December 2016, Vitro acquired the automotive glass  manufacturing business of Pittsburgh Glass Works ("PGW").

26.    Defendant Fuyao is an Ohio corporation with its principal place of business in Moraine, Ohio.  Fuyao is a leading manufacturer of aftermarket auto glass and sells aftermarket auto glass products to wholesalers throughout the United States.

27.    Defendant ATI is an Ohio corporation with its principal place of business located in Batavia, Ohio.  ATI is a leading manufacturer of aftermarket auto glass and sells aftermarket auto glass products to wholesalers throughout the United States.

28.    Defendant Sika is a New Jersey corporation with its principal place of business in Lyndhurst, New Jersey.  Sika is a leading manufacturer of urethane products and sells urethane products to wholesalers throughout the United States.

## FACTUAL ALLEGATIONS

**Aftermarket Auto Glass Manufacturing and Distribution**

29.        Aftermarket auto glass is manufactured to replace broken or faulty glass parts in

automobiles, such as windshields and side windows.  The specific aftermarket auto glass products compatible with an automobile will vary among the multitude of automobile makes and  models. The aftermarket auto glass products compatible with a particular automobile will often  vary by manufacturer.

30.     In replacing various aftermarket auto glass products, the installer uses urethane, a chemical adhesive, to ensure the glass is properly attached to the vehicle.  As a result, a urethane product is necessary in the installation of some aftermarket auto glass products and is sold to retailers by aftermarket auto glass wholesalers.  There are a limited number of urethane manufacturers that sell their products to wholesalers, the ranks of which include Defendant Sika.

31.     Aftermarket auto glass manufacturers produce and sell products in large quantities, typically hundreds of pieces of glass per order.  Thus, manufacturers typically do not sell auto glass directly to retailers; instead, manufacturers typically sell aftermarket auto glass to wholesalers.  The same is true for urethane manufacturers.

32.     Wholesalers purchase bulk orders from manufacturers and store the aftermarket auto glass and urethane in warehouses.  Wholesalers then sell their products to retailers.  Upon receiving a retailer's order, the wholesaler retrieves the desired piece(s) of aftermarket auto glass or urethane from its warehouse and delivers it to the retailer, typically that same day.  Given the costs of shipping and timing constraints for the retailers, wholesalers' customers are regional, located in proximity to the wholesalers' warehouse where the aftermarket auto glass is stored.

33.     Retailers sell aftermarket auto glass and urethane to consumers, and often install the replacement glass as well.  To meet their customers' needs, retailers must offer a range of aftermarket auto glass products, including urethane.  To avoid the inefficiencies and costs of purchasing a variety of products from numerous wholesalers, retailers utilize "one-stop shopping" to purchase their aftermarket auto glass products from a single wholesaler with a

diversified product offering.

34.     Thus, for an aftermarket auto glass wholesaler like OEMGN to be competitive, it must maintain a robust and varied stock of aftermarket auto glass products, including those produced by the Manufacturer Defendants, to enable the wholesaler to provide products within hours of a retailer's order.  Retailers will not do significant business with a wholesaler that cannot meet this basic need.

**Mygrant and Interstate Conspired with Manufacturers to Boycott OEMGN**

35.     Through its approximately 70 warehouse locations and hundreds of millions of dollars in annual purchases, Mygrant has significant purchasing power with aftermarket auto glass and urethane manufacturers.  Given its national presence, Mygrant enters into nationwide purchasing agreements with manufacturers worth millions of dollars.  Abusing this market heft, Mygrant and Interstate have conspired, and continue to conspire, with leading aftermarket auto glass manufacturers and urethane manufacturers to cut off OEMGN's supply channels and drive it out of business.

36.     Defendants' conspiracy is rooted in the competitive threat OEMGN poses to Mygrant and Interstate.  Mygrant and Interstate have coordinated their pricing to retailers. During a call on or about June 18, 2014 with a sales representative of Carlite, an auto glass manufacturer, the representative stated that Interstate's owner, Angelo Marino, boasted that he has called Mygrant to discuss and dictate the pricing of an aftermarket auto glass product sold by both Mygrant and Interstate. According to the representative, Mr. Marino stated that "we control the board on that [price]."  Mr. Marino also lamented that OEMGN acts as a "price-cutter." Prior to Defendants' boycott, OEMGN's disruptive presence endangered Interstate and Mygrant's ability to profitably coordinate their pricing in the New York Metropolitan Area.

37.     Rather than respond to OEMGN's pricing through lawful competition, Mygrant

and Interstate pressured aftermarket auto glass and urethane manufacturers to discontinue and/or refrain from selling products to OEMGN in order to drive OEMGN out of business. If a manufacturer refused to comply, the manufacturer would lose Mygrant's and Interstate's business, which exceeded the sales to OEMGN.

38.     Defendants planted the roots of their scheme in or about the end of 2013 and have continuously enforced and expanded it to the present date. In or about January 2014, a sales representative of Carlite informed OEMGN that both Mygrant and Interstate were starting to apply "significant pressure" to Carlite to stop selling to OEMGN. The Carlite representative demanded that OEMGN provide a list of all manufacturers from which it purchased aftermarket auto glass so that Carlite could provide the list to Mygrant and Interstate to avoid being "punish[ed]" by Mygrant for supplying OEMGN.

39.     On another call in or around that time period with a different Carlite sales representative, OEMGN was told that Carlite was required to relay the names of OEMGN's suppliers to Mygrant, or Carlite would stand to lose millions of dollars in annual sales. The representative also stated that Mygrant wanted to ensure that there "would be one less guy in town." The Carlite representative further noted that it was Mygrant's intent to "get competitors out of the area" with the purpose of limiting the number of competing wholesalers in the New York Metropolitan Area. He stated that Mygrant's list of acceptable competitors included "Angelo" (i.e., Interstate).

40.     Given its need to purchase Carlite's products, OEMGN had no choice but to comply with Carlite's demand. OEMGN reluctantly shared its list of suppliers with Carlite, but begged its representative to make sure "the names [of suppliers] stay between us." The representative nevertheless told OEMGN that he would send Mygrant the list of suppliers

10

because he had to "defend [himself] with two major customers [i.e., Mygrant and Interstate] that have concerns."

41.     As detailed below, thereafter, at the behest of and in concert with Mygrant and Interstate, the Manufacturer Defendants engaged in a course of conduct that effectively foreclosed OEMGN from purchasing an adequate supply of aftermarket auto glass and urethane to service retail customers, destroying OEMGN's ability to compete.

### A.     Vitro

42.     Defendant Vitro manufactures aftermarket auto glass products.

43.     Beginning in or around January 2014, OEMGN regularly began purchasing a variety of aftermarket auto glass products from Vitro.  Shortly thereafter, in or around early 2014, OEMGN placed an order with Vitro for aftermarket auto glass for delivery to its Brooklyn warehouse, but the shipment never arrived.  A few months later, in or around July 2014, an employee of a non-party manufacturer informed OEMGN that "there was a Vitro delivery that was supposed to come [to OEMGN] and went to Mygrant, and they -- that was the story on the market that [Mygrant] kept – [Mygrant] kept it."

44.     On June 18, 2014, a sales representative from Carlite recounted a conversation he had with Interstate's owner, Angelo Marino.  The Carlite representative stated that Mr. Marino admitted that Interstate and Mygrant had pressured Vitro to halt its sales to OEMGN and that "[OEMGN is] not going to make it."  Mr. Marino proclaimed that OEMGN was a "cancer" because manufacturers would not sell to OEMGN, and that Mygrant is "pretty successful at making sure that no one sells [to OEMGN]."

45.     On or around October 20, 2014, during a call between OEMGN and Vitro, Vitro's general manager informed OEMGN that "both" Mygrant and Interstate had pressured Vitro to

stop its sales to OEMGN.  Following that call, Vitro began reducing its sales to OEMGN.

46.     Finally, in or around November 2015, Vitro cut off all sales to OEMGN.  Vitro

has since refused to sell any aftermarket auto glass products to OEMGN.

47.     On a call in or around November or December 2015, Vitro's general manager

stated that he would not sell to OEMGN because he did not want to put the Mygrant account "in

risk."  The general manager again suggested that other wholesalers were complaining about

Vitro selling glass to OEMGN, but that "the one that concerned [him] the most [wa]s Mygrant."

48.     In a subsequent call in or around January 2016, the same general manager stated

that a high-level employee at Mygrant told him "not to sell" to OEMGN. The general manager

confirmed that Vitro was "selling a lot of product" to Mygrant.

49.     As a result of Vitro's agreement with Defendants and their co-conspirators,

OEMGN has been effectively excluded from purchasing Vitro aftermarket auto glass.

**B.     ATI**

50.     Defendant ATI is a manufacturer of aftermarket auto glass products.  On

numerous occasions, OEMGN has unsuccessfully attempted to purchase ATI aftermarket auto

glass products due to ATI's participation in the boycott alleged herein.

51.     In or around December 2013, in concert with Mygrant and Interstate, ATI agreed

to boycott all sales of its aftermarket auto glass products to OEMGN.  Since then, ATI has

repeatedly refused OEMGN's requests to purchase aftermarket auto glass products and has taken

measures to preclude OEMGN from purchasing ATI-manufactured glass through alternate

channels.

52.     On or about December 17, 2013, a Carlite sales representative called OEMGN

and informed the company of ATI's decision to boycott OEMGN.  The Carlite sales

representative had recently spoken with Matthew Fassler, co-owner of ATI.  According to the Carlite representative, ATI was concerned that it would lose "the bazillion dollars' worth of business" with Mygrant "every year" if ATI did not agree to boycott OEMGN.  According to the Carlite representative, Mr. Fassler stated that ATI would do Mygrant's bidding, noting that selling to OEMGN may not be "worth the risk [to ATI] of losing[] Mygrant's business."

53.     To bypass the boycott, OEMGN first sought to purchase ATI glass through a wholesaler, Auto Glass Outlet ("AGO").  For an aftermarket auto glass wholesaler like OEMGN, purchasing products from other wholesalers is feasible in a pinch, but is not a viable long-term strategy.  Wholesalers charge a markup, so the purchase is costlier to OEMGN than buying the product directly from the manufacturer.  And, wholesalers are unlikely to have a sufficiently voluminous and diverse stock to supply another wholesaler's competitive needs.

54.     After initially agreeing to sell aftermarket auto glass to OEMGN, AGO informed OEMGN in an email dated January 29, 2014, that there was going to be a "problem with ATI." The email noted that Douglas Fassler, co-owner of ATI, had called AGO and said that ATI could not sell AGO glass to sell to OEMGN because it would get ATI "in big trouble with Mygrant." Mr. Fassler told AGO that "Mygrant is on [ATI's] back to not give glass to anybody who support[s]" OEMGN.  Consequently, ATI restricted OEMGN from purchasing any glass from AGO.

55.     OEMGN also sought to purchase ATI glass through C-Auto Glass, Inc. ("C-Auto"), a wholesaler located in Cleveland, Ohio.  C-Auto is an aftermarket auto glass wholesaler that competes with Mygrant.  Mygrant has a warehouse located in Macedonia, Ohio, which is 23 miles from Cleveland.

56.     On or around January 28, 2014, OEMGN placed an order with C-Auto for ATI

auto glass.  In a January 29, 2014 email, C-Auto informed OEMGN that ATI would not even "quote" a price to C-Auto for the aftermarket glass products that ATI believed "may be going to Brooklyn or other NY markets."  In that email, C-Auto stated that they believed that ATI refused the sale because the "word is out that [OEMGN] is starting up."  Consequently, OEMGN's effort to purchase ATI glass through C-Auto failed.

57.     In or around February 2014, OEMGN sought to purchase ATI aftermarket auto glass products through American Glass Distributors ("AGD"), a large, regional wholesaler with locations and warehouses throughout Texas and Louisiana.  AGD is an aftermarket auto glass wholesaler that competes with Mygrant.  Both AGD and Mygrant have warehouses in Austin, Texas.  On or around February 11, 2014, OEMGN requested that AGD make a purchase on behalf of OEMGN.  The AGD representative emailed a response on the same day noting that the individual was "quite sure" ATI would not place a shipment to New York, and that "[e]ven with the best attempts at stealth (sic) these kinds of things are always found out."

58.     In or around July 2016, OEMGN called ATI's co-owner, Matthew Fassler, seeking to purchase aftermarket auto glass.   Mr. Fassler refused and confirmed that ATI supplies Mygrant and Interstate.

59.     On or around August 9, 2016, OEMGN called ATI's other co-owner, Douglas Fassler, seeking to purchase ATI aftermarket auto glass products.  Mr. Fassler refused.  He confirmed that ATI was refusing to sell aftermarket auto glass to OEMGN at the behest of Mygrant.

60.     As a result of ATI's agreement with Defendants and their co-conspirators, OEMGN has been excluded from purchasing ATI produced aftermarket auto glass.

###### C.     Fuyao

61.     Defendant Fuyao is an aftermarket auto glass manufacturer.  On numerous occasions, OEMGN has, due to Defendants' boycott, unsuccessfully attempted to purchase aftermarket auto glass products from Fuyao.  In or around early 2014, in concert with Mygrant and Interstate, Fuyao agreed to boycott all sales of its aftermarket auto glass products to OEMGN.

62.     In fact, during a call on or around June 2014 between a Carlite sales representative and OEMGN, the sales representative indicated to OEMGN that Angelo Marino of Interstate admitted that, due to the boycott, Fuyao "won't do business with [OEMGN]."  Since the commencement and continuous enforcement of the boycott, OEMGN has been unable to purchase aftermarket auto glass directly from Fuyao.

63.     In or around February of 2014, OEMGN attempted to purchase Fuyao glass from wholesaler AGD.  But when Fuyao discovered that the glass AGD wanted to order would be sold to OEMGN, Fuyao canceled the sale.

64.     On or about November 4, 2014, an AGD sales representative confirmed that the "only reason why" AGD could not sell Fuyao glass to OEMGN was that Fuyao feared "reciprocity no matter what from Mygrant."

65.     In another conversation between OEMGN and an AGD sales representative, the representative indicated that Fuyao was pressured by Mygrant to halt all sales to OEMGN. According to the sales representative, if AGD sold any Fuyao aftermarket glass to OEMGN, Fuyao would retaliate by either raising prices to AGD or by halting any future sales to AGD.

66.     On or around February 27, 2015, AGD admitted to OEMGN that, at the behest of Mygrant and Interstate "we in the industry are all supposed to unite to . . . keep you out of the

business."  The AGD sales representative told OEMGN that he would be willing to be

"circumspect" and sell OEMGN Fuyao-manufactured aftermarket auto glass.  However, this

never happened.  On or around July 19, 2016, that same AGD sales representative, stating that he

was "not afraid" to "talk candidly," informed OEMGN that due to pressure from Mygrant, Fuyao

(as well as Defendant Xinyi) mandated that AGD was "not allowed" to sell Fuyao (or Xinyi)

glass to OEMGN.  AGD thereafter refused to sell any aftermarket auto glass to OEMGN.

67.     As a result of Fuyao's agreement with Defendants and their co-conspirators,

OEMGN has been effectively excluded from purchasing Fuyao produced aftermarket auto glass.

      **D.**    **Xinyi**

68.     Defendant Xinyi is an aftermarket auto glass manufacturer that sells its products

to wholesalers across the United States.  Beginning in or around November 2013 OEMGN

regularly began purchasing a variety of aftermarket auto glass products from Xinyi.

69.     In or around 2014, in agreement with Mygrant and Interstate, Xinyi halted all

sales of its aftermarket auto glass products to OEMGN.  As a result, OEMGN cannot directly

purchase any Xinyi aftermarket auto glass products.

70.     On or around March 4, 2014, OEMGN sought to make purchases of aftermarket

auto glass from Shenzhen Benson Automobile Glass Co., Ltd. ("Benson"), a Xinyi subsidiary.

Upon discovery that OEMGN was seeking to purchase aftermarket auto glass through its

subsidiary, Xinyi halted the sale of Benson aftermarket auto glass products.

71.     In a discussion on or around September 5, 2014 regarding the halted Benson sale,

a Benson sales representative indicated that Benson would not sell to OEMGN because of the

"situation" with Mygrant.

72.     On or around May 12, 2015, Xinyi refused to sell aftermarket auto glass to

OEMGN, stating that it could not do so unless Mygrant "disappears."

73.     On or around July 19, 2016, an AGD sales representative, stating that he was "not afraid" to "talk candidly," informed OEMGN that due to pressure from Mygrant, Xinyi (as well as Fuyao) mandated that AGD was "not allowed" to sell Xinyi (or Fuyao) glass to OEMGN. AGD thereafter refused to sell any aftermarket auto glass to OEMGN.

74.     This was not the first time Mygrant and Xinyi conspired to boycott a competitor of Mygrant's.  In 2017, a Xinyi sales representative told OEMGN that Mygrant agreed with Xinyi to discontinue sales to certain of Mygrant's competitors in Florida.  The representative noted that Mygrant's competitive position gave it "a strong reason" to talk to Xinyi and establish a boycott any of its competitors.  During that discussion, the Xinyi representative again explained that Xinyi would not sell aftermarket auto glass products to OEMGN.

75.     Following that discussion, Xinyi refused to supply OEMGN with auto glass products.

76.     As a result of Xinyi's agreement with Defendants and their co-conspirators, neither Xinyi nor Benson will sell aftermarket auto glass to OEMGN, and Xinyi acted to prevent OEMGN from obtaining Xinyi glass from alternate channels.

### E.     Pittsburgh Glass Works

77.     Non-party Pittsburgh Glass Works, LLC ("PGW") is a manufacturer and wholesaler located in Pittsburgh, Pennsylvania.  PGW is a subsidiary of the LKQ Corporation, a leading provider of aftermarket auto parts.  In or around December 2016, PGW's auto glass manufacturing business was sold to Defendant Vitro.

78.     In January 2014, OEMGN and PGW's truckload division agreed, in principal, to the sale of PGW aftermarket auto glass products to OEMGN.  However, at the behest of

17

Interstate, PGW subsequently reversed its decision and refused to open OEMGN's account.

79.     In attempt to ascertain why PGW's truckload division refused to sell to OEMGN, OEMGN, in or around May 2016, spoke with a sales representative from Carlite who had recently spoken with PGW.  OEMGN learned that Interstate's owner, Angelo Marino, personally called PGW to "let [them] have it."  During that conversation between Interstate and PGW, Mr. Marino indicated to PGW that the company was "not supposed to be selling" any auto glass products to OEMGN.

### F.     International Auto Glass Distributors, Inc.

80.     Non-party International Auto Glass Distributors Inc., ("IAGD") is a wholesaler located in Bronx, New York.  IAGD is a competitor of Mygrant, Interstate, and OEMGN.

81.     On or around February 2014, IAGD called OEMGN to offer their "help" in purchasing aftermarket auto glass.  While IAGD initially agreed to sell to OEMGN, on or around March 2014, after selling OEMGN one part, IAGD's owner called OEMGN to terminate the arrangement.  According to IAGD's owner, he had received phone calls and had been pressured by "everyone," not to sell aftermarket auto glass to OEMGN.  OEMGN understood "everyone" to include Defendants Mygrant and Interstate.

82.     Ultimately, IAGD acquiesced to the pressure and refused to sell to OEMGN or place any orders for aftermarket auto glass on behalf of OEMGN.   As a result, OEMGN cannot redirect any purchases of aftermarket auto glass through IAGD.

### G.     Sika

83.     Defendants' conspiracy extends to boycotting OEMGN from the purchase of urethane – a product used in the installation of aftermarket auto glass – from leading manufacturers, including Defendant Sika.

18

84.     In or around early 2014, OEMGN sought to purchase urethane from Sika.  In or around January 2014, OEMGN called a Sika sales representative to discuss the status of a pending OEMGN sales account.  The Sika representative indicated that Mygrant had "strong-armed" Sika to boycott OEMGN because Mygrant "didn't want anyone dealing with [OEMGN]" and would "flatten anybody" that did.  According to the Sika sales representative, Dow Chemical – a competing manufacturer of urethane products – had informed Mygrant that Sika was opening a sales account with OEMGN.  The Sika sales representative further indicated that his boss, upon receiving Mygrant's demand to boycott sales to OEMGN, was concerned, because the company "couldn't jeopardize millions of dollars in business" just to sell to OEMGN.

85.     On or about February 9, 2015, OEMGN contacted Sika to purchase urethane. Sika refused to sell product to OEMGN.

86.     On or about June 28, 2018, OEMGN again contacted Sika in an attempt to purchase urethane.  Sika again refused to sell to OEMGN.

87.     As a result of Sika's agreement with Mygrant and its co-conspirators, OEMGN has been effectively excluded from purchasing Sika's urethane products.

## ANTITRUST ALLEGATIONS

**Interstate Commerce**

88.     Wholesale and retail sales and purchases of aftermarket auto glass products are each in, and affect, interstate commerce.

89.      Many of the conspiratorial and anticompetitive acts alleged herein undertaken by Defendants and their co-conspirators had, and continues to have, a direct, substantial, and reasonably foreseeable impact on interstate commerce.

**Anticompetitive Conduct**

90.    Mygrant is the United States' largest independent wholesaler of aftermarket auto glass, owning and operating approximately 70 different warehouses across the country.  Mygrant uses its nationwide presence and market power to influence auto glass manufacturers.  Specifically, Mygrant, in coordination with its competitor Interstate, pressured and extracted agreements from *at least* Vitro, ATI, Fuyao, and Xinyi – four of the largest aftermarket auto glass manufacturers – to boycott sales to OEMGN and prevent it from purchasing products via another wholesaler.  Mygrant and Interstate also obtained agreements from non-party wholesalers to refrain from selling aftermarket auto glass products to OEMGN.

91.    In addition, Mygrant has pressured and extracted agreements from Defendant Sika to halt all sales of its urethane products to OEMGN.

92.    Defendants have abused their market power to reduce competition in the market for wholesale purchases of aftermarket auto glass products.  Specifically, Mygrant and Interstate have conspired with manufacturers to boycott sales of aftermarket auto glass products to OEMGN.

93.    Rather than face competition within the aftermarket auto glass wholesale industry, Mygrant and Interstate used their collective monopsony power to reduce choice and competition.

94.    Defendants have succeeded in their scheme.  As a result of their illegal conduct, OEMGN has been boycotted by Defendants and their co-conspirators.  This has precluded OEMGN from acquiring a sufficient stock of aftermarket auto glass products to maintain a viable and competitive business.

95.    Defendants cannot offer any legitimate business or procompetitive justification for their agreement to boycott sales to OEMGN.

**Relevant Markets**

96.     The relevant product market is the market for wholesale sales of aftermarket auto glass products.  The market for wholesale sales of aftermarket auto glass products is a relevant market because few, if any, feasible alternatives exist to customers of such services (i.e., retailers).  Given the costs of shipping and storing aftermarket auto glass and urethane, retailers utilize the services of wholesalers that can purchase large quantities from numerous manufacturing sources.  Wholesalers carry and store a variety of aftermarket auto glass products that can be shipped to regional customers for purchase and installation in a consumer's vehicle. A hypothetical monopolist wholesaler of aftermarket auto glass products could therefore profitably raise the price of the products they sell in a small, but significant, non-transitory manner.

97.     The relevant geographic market is no larger than the New York Metropolitan Area, which includes New York City, Long Island, and Northern New Jersey.  Aftermarket auto glass wholesalers operate regionally.  They own and operate warehouses that allow them to store bulk purchases of aftermarket auto glass products that can then be quickly delivered – primarily by truck – to their retail customers.  Retail customers demand delivery in short order (typically same-day); therefore, wholesaler warehouses must be located within close proximity of the retailers.

98.     The geographic market is further supported by the high costs of shipping.  To offer competitive pricing to their retailer customers, wholesalers do not ship aftermarket auto glass products over long distances to their clients.  Due to the high costs of shipping, it would be economically unfeasible for a wholesaler located outside of the New York Metropolitan Area to ship to a retail client inside the geographic market.

99.     Accordingly, few, if any, aftermarket auto glass retailers in the New York Metropolitan Area would choose to obtain aftermarket auto glass products from wholesalers located outside of the area, even if faced with a price increase or a reduction in the quality of such products.  This demonstrates that the geographic dimensions of the relevant market are no larger than the New York Metropolitan Area.

**Market Power**

100.     Mygrant, individually and jointly with Interstate, has market power in the market for wholesale sales of aftermarket auto glass products in the New York Metropolitan Area including because, as demonstrated by the facts alleged herein, it has the power to profitably raise prices above a competitive level (including by coordinating pricing with Interstate) and preclude would-be rivals from entering the market to compete with the price increase.  This results in an exclusion of competition.  Mygrant is one of the only national wholesalers of aftermarket auto glass products, with hundreds of millions of dollars in sales nationwide. Mygrant garners national contracts with manufacturers, allowing it to ship aftermarket auto glass products to any of its approximately 70 warehouses nationwide.  Manufacturers are well aware of Mygrant's national purchasing power.  Losing access to Mygrant's national wholesale purchasing power can cost a manufacturer millions of dollars in potential sales.

101.     Mygrant has leveraged its national purchasing power over the Manufacturer Defendants, in concert with Interstate, to suppress competition from OEMGN by threatening to cease purchasing from those manufacturers if they sell to OEMGN.  Mygrant, in concert with the Manufacturer Defendants, has also successfully pressured wholesalers with which Mygrant competes to agree to refrain from selling aftermarket auto glass products to OEMGN.  Finally, Mygrant, in concert with Interstate, has forced Sika to agree to halt all sales of its urethane

products to OEMGN.

102.    As a result, OEMGN has been unable to procure aftermarket auto glass products produced by the Manufacturer Defendants.  This has precluded OEMGN from adequately servicing its retail customers, expanding its business, and effectively competing within the market.  Defendants' demonstrated ability to exclude competition in the relevant market is direct evidence of their market power.

**Harm to Competition**

103.    Defendants' coordinated boycott of OEMGN has harmed and continues to harm competition in the relevant market.

104.    Defendants' illegal conduct has prevented retail aftermarket auto glass customers from obtaining the benefit of a competitive, price-cutting wholesaler that delivers orders within hours of placement.  Defendants' boycott has limited customer choice, reduced output, reduced quality, and has led to retailers and, in turn, consumers, paying higher prices for aftermarket auto glass products.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**(*Per Se* or Rule of Reason Group Boycott – Sherman Act)**

105.    OEMGN repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

106.    Defendants possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

107.    At times relevant to this Complaint, each of the Defendants, together with their co-conspirators, has entered into contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

108.     These contracts, combinations, or conspiracies have caused substantial anticompetitive effects, including the exclusion of competition by OEMGN, a wholesaler that competes with Mygrant and Interstate, ultimately leading to higher consumer prices for aftermarket auto glass products.

109.     These contracts, combinations, or conspiracies have no legitimate business justification or offsetting procompetitive benefit.  They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

110.     As a result of these violations of Section 1 of the Sherman Act (15 U.S.C. § 1), OEMGN has been and continues to be injured in its business and property in an amount not presently known.

### SECOND CLAIM FOR RELIEF
### (*Per Se* or Rule of Reason Group Boycott – Donnelly Act)

111.     OEMGN repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

112.     Defendants possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

113.     At times relevant to this Complaint, each of the Defendants, together with their co-conspirators, has engaged in a contract, agreement, arrangement, or combination in unreasonable restraint of trade and commerce in violation of the Donnelly Act §§ 340 et seq. of the New York General Business Law.

114.     This contract, agreement, arrangement, or combination consisted of, among other things, an agreement by Defendants and their co-conspirators to exclude competition by OEMGN, a wholesaler that competes with Mygrant and Interstate, ultimately leading to higher consumer prices for aftermarket auto glass products.

115.    Defendants' unlawful activities are a *per se* violation of the Donnelly Act.

116.    Defendants' unlawful activities also violate the Donnelly Act under the Rule of Reason.

117.    These contracts, agreements, arrangements, or combinations establish, may establish, or may maintain a monopoly for Mygrant in the market for sales of aftermarket auto glass products to retailers in the relevant market.

118.    These contracts, agreements, arrangements, or combinations restrain or may restrain competition or the free exercise of activity of aftermarket auto glass wholesalers in the conduct of the purchase of aftermarket auto glass products from manufacturers and the sale of aftermarket auto glass products to retailers in the relevant market.

119.    These contracts, agreements, arrangements, or combinations exist for the purpose of unlawfully interfering with or restraining the free exercise of activity by wholesalers in the conduct of the purchase of aftermarket auto glass products from manufacturers and the sale of aftermarket auto glass products to retailers in the relevant market.

120.    These contracts, agreements, arrangements, or combinations have no legitimate business justification or offsetting procompetitive benefit.  They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

121.    As a result of these violations of the Donnelly Act, OEMGN has been and continues to be injured in its business and property in an amount not presently known.

### THIRD CLAIM FOR RELIEF
### (Tortious Interference with Prospective Business Relations)

122.    OEMGN repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

123.    OEMGN's ability to operate its business is dependent on OEMGN's ability to

purchase aftermarket auto glass products directly from manufacturers.  In limited circumstances, absent Defendants' misconduct, OEMGN would also be able to purchase products from other wholesalers to meet certain customer needs.  These business realities are well known to Defendants.

124.    To ensure it can service the particular product needs of retailers, wholesalers must maintain a sufficiently diverse stock of aftermarket auto glass products.  Accordingly, a wholesaler must be able to buy aftermarket auto glass products from a variety of the Manufacturer Defendants and Sika.  This business reality is well known to Defendants Mygrant and Interstate.

125.    Defendants Mygrant and Interstate knew that each Manufacturer Defendant and OEMGN had entered into, and/or would enter into, contracts for the sale of aftermarket auto glass products and supplies.  Defendants also knew that OEMGN and other wholesalers would enter into contracts pursuant to which the wholesalers would sell aftermarket auto glass to OEMGN.

126.    By engaging in the conduct alleged herein, Defendants – through wrongful means – interfered with OEMGN's prospective contracts and business relations with the its current and potential suppliers.

127.    Defendants' interference was for no other purpose than to harm OEMGN.

128.    As a result of Defendants' tortious interference, OEMGN has been injured in its business and property in an amount not presently known.

## **PRAYER FOR RELIEF**

WHEREFORE, OEMGN respectfully requests:

A.  that the Court declare, adjudge, and decree that Defendants have committed the

violations of law alleged herein;

B. that Defendants provide OEMGN with damages, in an amount to be proven at trial, to be trebled according to law, plus interest-including prejudgment interest-to compensate OEMGN for the damages it incurred from Defendants' violations of law;

C. that the Court award OEMGN attorneys' fees;

D. that the Court award OEMGN the costs of suit; and

E. such other and further relief this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

Dated: August 5, 2019                              **CONSTANTINE CANNON LLP**

David A. Scupp
Daniel Vitelli
335 Madison Avenue
New York, NY 10017
Tel: 212-350-2700
Fax: 212-350-2701
dscupp@constantinecannon.com
dvitelli@constantinecannon.com

James J. Kovacs
1001 Pennsylvania Ave., NW, Suite 1300N
Washington, D.C. 20004
Tel: 202-204-3500
Fax: 202-204-3501
jkovacs@constantinecannon.com

Leah Judge
150 California Street, 16th Floor
San Francisco, CA 94111
Tel: (415) 639-4001
Fax: (415) 639-4002
ljudge@constantinecannon.com

*Counsel for Plaintiffs*