UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

O.E.M. GLASS NETWORK, INC. and BROOKLYN
WHOLESALE GLASS INC.,

                    Plaintiffs,

            -against-

MYGRANT GLASS COMPANY, INC.,
INTERSTATE GLASS OF AMITYVILLE NY,
LLC, METRO GLASS DISTRIBUTING, INC.,
XINYI AUTO GLASS NORTH AMERICA
CORP., VITRO, S.A.B. de C.V., VITRO
AUTOMOTIVE GLASS LLC, FUYAO GLASS
AMERICA INC., AUTO TEMP INC., and SIKA
CORPORATION,

                    Defendants.

------------------------------------------------------------------------X



**MEMORANDUM & ORDER**
**19-CV-742 (NGG) (LB)**

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★  JAN 3 1 2020  ★

BROOKLYN OFFICE

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs O.E.M. Glass Network, Inc. and Brooklyn Wholesale Glass Inc. (collectively,

"OEMGN" or "Plaintiffs") bring antitrust claims against Defendants Mygrant Glass Company,

Inc. ("Mygrant"); Interstate Glass of Amityville NY, LLC and Metro Glass Distributing, Inc.

(collectively, "Interstate"); Xinyi Auto Glass North America Corp. ("Xinyi"); Vitro, S.A.B. de

C.V., Vitro Automotive Glass LLC, and Vitro Automotriz, S.A. de C.V. ("Vitro Automotriz,"

and, collectively with Vitro S.A.B. de C.V. and Vitro Automotive Glass LLC, "Vitro"); Fuyao

Glass America Inc. ("Fuyao"); Auto Temp Inc. ("ATI"); and Sika Corporation ("Sika"). (Am.

Compl. (Dkt. 99).) Plaintiffs allege that Defendants entered into an illegal conspiracy to

eliminate OEMGN, a wholesaler of aftermarket auto glass, by orchestrating a group boycott

among OEMGN's competitors and suppliers. (*Id.* ¶ 1.) Plaintiffs allege that this conduct

amounts to a *per se* illegal group boycott (*id.*), and that Defendants' conduct violates the

1

Sherman Act and New York's Donnelly Act and constitutes tortious interference with OEMGN's prospective business relations (*id.* ¶ 6).

Currently pending before the court is Defendants' motion to dismiss Plaintiffs' Amended Complaint. (*See* Defs. Mot. to Dismiss ("Mot.") (Dkt. 88); *see also* Aug. 21, 2019 Stip. & Order (Dkt. 102) (applying Defendants' fully briefed motion to Plaintiffs' Amended Complaint).) For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

### A.  Facts

The court takes the following statement of facts from Plaintiffs' Amended Complaint, the well-pleaded allegations of which the court generally accepts as true. *See N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017).

#### 1.  The Parties

OEMGN is an aftermarket auto glass[1] wholesaler. (Am. Compl. ¶ 2.) It purchases aftermarket auto glass products from manufacturers and resells those products to consumers in the New York Metropolitan Area. (*Id.*)

Defendants Mygrant and Interstate (collectively, the "Wholesaler Defendants") are also aftermarket auto glass wholesalers that operate in the New York Metropolitan area. (*Id.* ¶¶ 22-23.) Mygrant is the largest independent aftermarket auto glass wholesaler in the United States; it owns and operates approximately 70 warehouses nationwide. (*Id.* ¶ 22.) According to Plaintiffs, Mygrant is "one of the only national wholesalers of aftermarket auto glass products" with sales totaling hundreds of millions of dollars per year. (*Id.* ¶¶ 22, 100.)

---

[1] Aftermarket auto glass is manufactured to replace broken or faulty glass parts in automobiles, such as windshields and side windows. (Am. Compl. ¶ 29.)

Defendants Xinyi, Vitro, Fuyao, and ATI are manufacturers of aftermarket auto glass products. (*Id.* ¶¶ 24-27.) Defendant Sika is a manufacturer of products containing urethane, a chemical adhesive used in the installation of some aftermarket auto glass products. (*Id.* ¶ 30.) Xinyi, Vitro, Fuyao, and ATI and Sika (collectively, the "Manufacturer Defendants") sell their products to wholesalers like Plaintiffs and the Wholesaler Defendants. (*Id.* ¶ 31.)

2.   The Alleged Conspiracy

Plaintiffs allege that OEMGN differentiates itself from its competitors by offering lower prices and that this "presents a disruptive threat to entrenched wholesalers" like the Wholesaler Defendants. (*Id.* ¶ 2.) According to Plaintiffs, the Wholesaler Defendants responded to this threat by refusing to purchase from manufacturers that deal with OEMGN and by pressuring manufacturers and other wholesalers to boycott OEMGN. (*Id.* ¶¶ 3, 5.)

OEMGN first learned of the alleged conspiracy in January 2014 from a sales representative at Carlite, a non-party auto glass manufacturer. (*Id.* ¶¶ 36, 38.) At that time, the Carlite employee informed OEMGN that the Wholesaler Defendants were applying "significant pressure" to Carlite to stop selling glass to OEMGN. (*Id.* ¶ 38.) In order to avoid being "punish[ed]" by the Wholesaler Defendants, the Carlite employee demanded that OEMGN provide a list of its suppliers to relay to Mygrant. (*Id.* ¶ 38.) A different Carlite employee subsequently told OEMGN that Mygrant wanted to ensure that there "would be one less guy in town," and that Mygrant intended to "get competitors out of the area." (*Id.* ¶ 39.) Mygrant had allegedly indicated, however, that Interstate was an "acceptable competitor." (*Id.*) OEMGN thought it "had no choice but to comply with Carlite's demand" and "reluctantly" shared its list of suppliers with Carlite. (*Id.* ¶ 40.) The Carlite representative said he would share the list with

3

Mygrant because he had to "defend [himself] with two major customers that have concerns." (*Id.*)

Plaintiffs allege that each of the Manufacturer Defendants, along with at least two additional non-parties, participated in the conspiracy orchestrated by the Wholesaler Defendants to boycott OEMGN.

### a. Vitro

OEMGN began regularly purchasing aftermarket auto glass products from Vitro in approximately January 2014. (*Id.* ¶ 43.) Shortly after the relationship began, OEMGN placed an order with Vitro that never arrived. (*Id.*) A few months later, in or around July 2014, an employee of a non-party manufacturer allegedly informed OEMGN that "there was a Vitro delivery that was supposed to come [to OEMGN] and went to Mygrant." (*Id.*)

On June 18, 2014, a sales representative from Carlite recounted a conversation he had with Interstate's owner, Angelo Marino, during which Mr. Marino allegedly admitted that the Wholesaler Defendants pressured Vitro to halt its sales to OEMGN. (*Id.* ¶ 44.) Mr. Marino allegedly said that "[OEMGN] is not going to make it" because Mygrant had been "pretty successful in making sure no one sells [to OEMGN]." (*Id.*) On October 20, 2014, Vitro's General Manager allegedly informed OEMGN that both Wholesaler Defendants had pressured Vitro to stop its sales to OEMGN. (*Id.* ¶ 45.) Vitro subsequently reduced its sales to OEMGN, before completely cutting off sales to OEMGN sometime in 2015. (*Id.* ¶¶ 45-46.)

Near the end of 2015, Vitro's General Manager informed OEMGN that Vitro would not be selling to OEMGN to avoid putting its Mygrant account "at risk." (*Id.* ¶ 47.) He said that multiple wholesalers complained about Vitro selling to OEMGN, but that "the one that concerned [him] the most [wa]s Mygrant." (*Id.* ¶ 47.) In January 2016, the same manager stated

that a high-level employee at Mygrant told him not to sell to OEMGN. (*Id.* ¶ 48.) He also confirmed that Vitro was "selling a lot of product" to Mygrant. (*Id.*)

                      *b.*    *ATI*

Plaintiffs allege that OEMGN has unsuccessfully attempted to purchase ATI aftermarket auto glass products on several occasions. (*Id.* ¶ 50.) Specifically, the Amended Complaint alleges that "[i]n or around December 2013, in concert with Mygrant and Interstate, ATI agreed to boycott all sales of its aftermarket auto glass products to OEMGN." (*Id.* ¶ 51.) ATI has not sold to OEMGN since that time, despite repeated inquiries, and has allegedly "taken measures to preclude OEMGN from purchasing ATI-manufactured glass through alternate channels." (*Id.*)

OEMGN allegedly heard of ATI's decision to boycott OEMGN during a call with a Carlite sales representative on December 17, 2013. (*Id.* ¶ 52.) The representative informed OEMGN that he had recently spoken with Matthew Fassler, co-owner of ATI, who had expressed concern about losing a "bazillion dollars' worth of [Mygrant's] business" if ATI did not boycott OEMGN. (*Id.*) Mr. Fassler also allegedly said that selling to OEMGN may not be "worth the risk . . . of losing[] Mygrant's business." (*Id.*)

OEMGN attempted to buy ATI-manufactured glass products from another wholesaler, non-party Auto Glass Outlet ("AGO"). (*Id.* ¶ 53.) AGO initially agreed; in January 2014, however, AGO informed OEMGN that it would not complete the sale because Douglas Fassler, the other co-owner of ATI, told AGO it would not sell to it if products were passed on to OEMGN. (*Id.* ¶ 54.) Mr. Fassler further told AGO that "Mygrant was on [its] back not to give glass to anybody who support[s] OEMGN" and that, if it AGO sold ATI products to OEMGN, ATI would be "in big trouble with Mygrant." (*Id.* ¶ 54.) Similarly, OEMGN sought to purchase ATI glass through non-party C-Auto Glass, Inc. ("C-Auto"), another non-party wholesaler. (*Id.*

¶ 55.) In a January 29, 2014 email, however, C-Auto informed OEMGN that ATI would not even provide a quote for products that it believed "may be going to Brooklyn or other NY markets." (*Id.* ¶ 56.) In February 2014, American Glass Distributors—a "large regional wholesaler"—likewise refused to sell ATI products to OEMGN, noting that "[e]ven with the best attempts at stealth these things are always found out." (*Id.* ¶ 57.)

On August 9, 2016, Douglas Fassler allegedly confirmed that ATI was refusing to sell to OEMGN at Mygrant's request. (*Id.* ¶ 59.)

### c.   *Fuyao*

Plaintiffs allege that OEMGN has unsuccessfully attempted to purchase Fuyao aftermarket auto glass products on several occasions. (*Id.* ¶ 61.) The Amended Complaint alleges that "[i]n or around early 2014, in concert with Mygrant and Interstate, Fuyao agreed to boycott all sales of its aftermarket auto glass products to OEMGN." (*Id.*)

Plaintiffs allege several specific incidents in support of this assertion. In February 2014, OEMGN attempted to purchase Fuyao glass from AGD. (*Id.* ¶ 63.) However, Plaintiffs allege that Fuyao canceled the sale when it learned that the glass AGD ordered would be sold through to OEMGN. (*Id.*) Then, in June 2014, OEMGN heard from a Carlite sales representative that Angelo Marino of Interstate said that Fuyao "won't do business with [OEMGN]" because of the boycott. (*Id.* ¶ 62.) On November 4, 2014, an AGD sales representative confirmed that the "only reason why" AGD could not sell Fuyao glass to OEMGN was Fuyao's fear of "reciprocity no matter what from Mygrant." (*Id.* ¶ 64.) In another conversation between OEMGN and an AGD sales representative, the representative indicated that Mygrant pressured Fuyao to halt all sales to OEMGN. (*Id.* ¶ 65.) According to the sales representative, if AGD sold any Fuyao

aftermarket glass to OEMGN, Fuyao would retaliate by either raising prices to AGD or by halting any future sales to AGD. (*Id.*)

Finally, on or around February 27, 2015, AGD admitted to OEMGN that, at the behest of the Wholesaler Defendants, "we in the industry are all supposed to unite to . . . keep you out of the business." (*Id.* ¶ 66.) At that time, the AGD sales representative allegedly told OEMGN that he would be "circumspect" and sell OEMGN Fuyao-manufactured products. (*Id.*) However, this never happened. (*Id.*) On or around July 19, 2016, that same AGD sales representative informed OEMGN that, due to pressure from Mygrant, Fuyao insisted that AGD was "not allowed" to sell Fuyao glass to OEMGN. (*Id.*) AGD thereafter refused to sell any aftermarket auto glass to OEMGN. (*Id.*)

#### d.  Xinyi

Starting in approximately November 2013, OEMGN regularly purchased aftermarket auto glass products from Xinyi. (*Id.* ¶ 68.) At some point in 2014, however, Plaintiffs allege that "in agreement with Mygrant and Interstate, Xinyi halted all sales of its aftermarket auto glass products to OEMGN." (*Id.* ¶ 69.)

On or around March 4, 2014, OEMGN sought to buy aftermarket auto glass from Shenzhen Benson Automobile Glass Co., Ltd. ("Benson"), a Xinyi subsidiary. (*Id.* ¶ 70.) As soon as it learned of the sale, Xinyi stopped it. (*Id.*) In a discussion on or around September 5, 2014, a Benson sales representative indicated that Benson would not sell to OEMGN because of the "situation" with Mygrant. (*Id.* ¶ 71.) Then, on or around May 12, 2015, Xinyi simply refused to sell aftermarket auto glass to OEMGN, stating that it could not do so unless Mygrant "disappear[ed]." (*Id.* ¶ 72.) On or around July 19, 2016, an AGD sales representative informed

OEMGN that due to pressure from Mygrant, Xinyi mandated that AGD was "not allowed" to sell Xinyi glass to OEMGN. (*Id.* ¶ 73.) AGD thereafter refused to sell to OEMGN. (*Id.*)

Plaintiffs further allege that in 2017, a Xinyi sales representative told OEMGN that Mygrant had previously agreed with Xinyi to discontinue sales to certain of Mygrant's competitors in Florida. (*Id.* ¶ 74.) The representative noted that Mygrant's competitive position gave it "a strong reason" to talk to Xinyi and establish a boycott any of its competitors. (*Id.*) During that discussion, the Xinyi representative again explained that Xinyi would not sell aftermarket auto glass products to OEMGN. (*Id.*)

### e. Pittsburgh Glass Works

Non-party Pittsburgh Glass Works, LLC ("PGW") is a manufacturer and wholesaler in Pittsburgh, Pennsylvania. (*Id.* ¶ 77.) PGW is a subsidiary of the LKQ Corporation, a leading provider of aftermarket auto parts. (*Id.*) In or around December 2016, PGW sold its auto glass manufacturing business to Vitro. (*Id.*) Plaintiffs allege that in January 2014, OEMGN and a PGW division agreed to a sale of PGW aftermarket auto glass products. (*Id.* ¶ 78.) However, at Interstate's behest, PGW subsequently reversed its decision and refused to open OEMGN's account. (*Id.*) In or around May 2016, OEMGN spoke with a sales representative from Carlite who had recently spoken with PGW. (*Id.* ¶ 79.) During this call, OEMGN allegedly learned that Interstate's owner, Angelo Marino, personally called PGW to "let [them] have it." (*Id.*) During that conversation between Interstate and PGW, Mr. Marino allegedly indicated that PGW was "not supposed to be selling" any auto glass products to OEMGN. (*Id.*)

### f. International Auto Glass Distributors, Inc.

Non-party International Auto Glass Distributors Inc. ("IAGD") is a wholesaler in Bronx, New York. (*Id.* ¶ 80.) IAGD is a competitor of Mygrant, Interstate, and OEMGN. (*Id.*) On or

around February 2014, IAGD called OEMGN to offer their "help" in purchasing aftermarket auto glass. (*Id.* ¶ 81.) However, on or around March 2014, IAGD's owner called OEMGN to terminate the arrangement. (*Id.*) According to IAGD's owner, "everyone" had pressured him not to sell aftermarket auto glass to OEMGN. (*Id.*) OEMGN understood "everyone" to include the Wholesaler Defendants. (*Id.*) Ultimately, IAGD refused to sell to OEMGN or to place any orders for aftermarket auto glass on behalf of OEMGN. (*Id.* ¶ 82.)

g. *Sika*

In or around early 2014, OEMGN sought to purchase urethane from Sika. (*Id.* ¶ 84.) In or around January 2014, OEMGN called a Sika sales representative to discuss the status of a pending OEMGN sales account. (*Id.*) The Sika representative indicated that Mygrant had "strongarmed" Sika to boycott OEMGN because Mygrant "didn't want anyone dealing with [OEMGN]" and would "flatten anybody" that did. (*Id.*) According to the Sika sales representative, Dow Chemical—which also manufactures urethane products—informed Mygrant that Sika was opening a sales account with OEMGN. (*Id.*) The Sika sales representative further indicated that his boss, upon receiving Mygrant's demand to boycott sales to OEMGN, was concerned, because the company "couldn't jeopardize millions of dollars in business" just to sell to OEMGN. (*Id.*) OEMGN subsequently contacted Sika to purchase urethane in February and June of 2018; Sika refused to sell product to OEMGN on both occasions. (*Id.* ¶¶ 85-86.)

B. **Procedural History**

Plaintiffs filed their complaint in this court on February 6, 2019 asserting claims for antitrust conspiracy in violation of the Sherman Act (15 U.S.C. § 1) and New York's Donnelly Act (New York General Business Law §§ 340 et seq.), as well as a claim for tortious interference with OEMGN's prospective business relations. (Compl. (Dkt. 1) ¶¶ 105-28.)

9

Defendants—other than Vitro Automotriz—filed their fully briefed motion to dismiss on May 17, 2019. (Mot.; Pls. Mem. in Opp'n to Mot. ("Opp'n") (Dkt. 93); Defs. Reply in Further Supp. of Mot. ("Reply" (Dkt. 94).)

On August 5, 2019, Plaintiffs amended their complaint to add as a defendant Vitro Automotriz, a subsidiary of Vitro, S.A.B. de C.V. (Am. Compl.; *see also* Pls. June 28, 2019 Letter (Dkt. 97).) Shortly thereafter, the parties stipulated that Defendants' motion to dismiss shall be deemed to apply to the Amended Complaint as to the previously-served Defendants. (Aug. 21, 2019 Stip. & Order.) On November 27, 2019, Vitro Automotriz filed a motion to dismiss and motion to join the other Defendants' motion to dismiss. (Vitro Automotriz Mot. to Dismiss and Mot. for Joinder (Dkt. 109).) The court GRANTS Vitro Automotriz's motion to join, and considers its motion to dismiss along with the other Defendants' motion.

## II.    LEGAL STANDARD

### A.    Motions to Dismiss

#### 1.    Generally

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In deciding Defendants' motion to dismiss, the court "will accept all factual allegations in the [c]omplaint as true and draw all reasonable inferences in [Plaintiffs'] favor." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). However, the court will "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court

must then evaluate the "well-pleaded factual allegations" and "determine whether they plausibl[y] give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Even when, before discovery, "facts are peculiarly within the possession and control of the defendant," the complaint must still provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegality." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

### 2. For a Complaint Pleading Antitrust Conspiracy

A complaint pleading an antitrust conspiracy "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action," and "[s]kepticism of a conspiracy's existence is insufficient to warrant dismissal." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). Nonetheless, "a finding of conspiracy requires 'evidence that tends to exclude the possibility' that the defendant was 'acting independently.'" *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

A plaintiff may properly allege an antitrust conspiracy by asserting direct or indirect evidence of an illegal agreement. *See Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018). Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted," and may include "a document or conversation explicitly manifesting the existence of the agreement in question." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010) (citation omitted); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[A] plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. . . . Such evidence would consist, for

example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." (citation omitted)).

Indirect evidence, on the other hand, includes "circumstantial facts supporting the *inference* that a conspiracy existed." *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 317 (quoting *Mayor & City Council of Balt.*,709 F.3d at 136). Frequently, antitrust plaintiffs are able to allege only indirect evidence because "conspiracies are rarely evidenced by explicit agreements and nearly always must be proven though inferences that may fairly be drawn from the behavior of the alleged conspirators." *Gelboim*, 823 F.3d at 781 (quotation marks and citation omitted). However, "merely alleging parallel conduct alone is not sustainable." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) (citing, *inter alia, Twombly*, 550 U.S. at 556; *Mayor & City Council of Balt.*, 709 F.3d at 135-36). A plaintiff can successfully allege a claim by setting forth parallel behavior accompanied by "plus factors," such as "(1) a common motive to conspire; (2) evidence . . . show[ing] that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *Gelboim*, 823 F.3d at 781; *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010) (holding that a plaintiff need only "allege[] specific facts sufficient to plausibly suggest that the parallel conduct alleged was the result of an agreement among the defendants").

## III.   DISCUSSION

### A.   Federal Antitrust Claims

#### 1.   Section 1 of the Sherman Act

"Section 1 of [the Sherman Act] makes illegal every contract, combination[,] or conspiracy in restraint of trade or commerce among the several states." *Fashion Originators'*

*Guild of America, Inc. v. FTC*, 312 U.S. 457, 465 (1941); *see also* 15 U.S.C. § 1. "Although the Sherman Act, by its terms, prohibits every agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints." *Apple*, 791 F.3d at 321(citations and quotation marks omitted) (alterations adopted).

Such a contract, combination, or conspiracy may be either horizontal or vertical in nature. A horizontal agreement is between competitors at the same level of the market (*e.g.*, two wholesalers), while a vertical agreement is between actors at different levels of the market (*e.g.*, a wholesaler and a manufacturer). *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 243 (2d Cir. 1997). Horizontal restraints are "classic examples" of "obviously unreasonable restraints," and, as such, "trigger *per se* liability under Section 1" of the Sherman Act. *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 447 (S.D.N.Y. 2014) (citations omitted). Vertical restraints, on the other hand, "are generally subject to 'rule of reason' analysis." *Elecs. Commc'ns Corp.*, 129 F.3d at 243 (citations omitted). Under this analysis, "an agreement will not violate the antitrust laws unless it can be shown that it will have an actual adverse effect on competition in the relevant market." *Id.* at 244. "Whether . . . Defendants' alleged conduct constitutes a horizontal conspiracy, and therefore is a *per se* violation, is a legal conclusion that the Court does not accept as true on a motion to dismiss." *Ace Arts*, 56 F. Supp. 3d at 448 (quoting *Integrated Sys. & Power, Inc. v. Honeywell Int'l., Inc.*, 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010)).

Courts also recognize "the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" *Apple*, 791 F.3d at 314 (citation omitted). "These arrangements consist of both vertical agreements between the hub and each spoke and a horizontal agreement

among the spokes 'to adhere to the hub's terms,' often because the spokes 'would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing.'" *Id.* (citation omitted) (alteration adopted). "[A] hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 376) (citing *Apple*, 791 F.3d at 314).

All participants in such conspiracies are liable "when the objective of the conspiracy was a *per se* unreasonable restraint of trade." *Apple*, 791 F.3d at 323. And "certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 245 (S.D.N.Y. 2019) (quoting *NW Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985)). "A concerted refusal to deal or group boycott is 'an agreement to pressure a supplier or customer not to deal with another competitor.'" *Id.* (quoting *Reading Int'l, Inc. v. Oaktree Capital Mgmt., Inc.*, 317 F. Supp. 2d 301, 318 (S.D.N.Y. 2003)).

## 2. Statute of Limitations

Defendants Xinyi and Sika argue that Plaintiffs' antitrust claims against them are barred by the Sherman Act's four-year statute of limitations. (*See* Mem. at 22, 24; Reply at 13-15.)[2] The court agrees as to Sika, but not as to Xinyi.

---

[2] Defendants Mygrant, Interstate, ATI, and Fuyao also seem to assert that some of Plaintiffs' allegations against them are time-barred because they relate to actions taken four years ago (Mem. at 10 n.4, 12 n.5, 17). Plaintiffs are correct, however, that "[a]lthough OEMGN may not recover damages accruing more than four years prior to the filing of the Complaint, the Court may still consider allegations of pre-limitations conspiratorial conduct to establish the conspiracy" where Plaintiffs' claims themselves are not time-barred. (Opp'n at 30.) *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017) (considering pre-limitations period allegations when determining whether the plaintiffs had sufficiently alleged conspiracy); *cf. Zenith*, 401 U.S. 338 (allowing for

Under the Sherman Act, a plaintiff must file suit within four years after a cause of action accrues. 15 U.S.C. § 15b. "An antitrust cause of action generally 'accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 263-64 (E.D.N.Y. 2010) (Garaufis, J.) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). "When an antitrust injury is caused [by] a single injurious act, the statute of limitations runs from that act, even if the resulting injury continues over a prolonged period." *Id.* at 267 (citing, *inter alia, Zenith*, 401 U.S. at 338-39). "If, however, an antitrust violation consists of a series of acts that repeatedly invade a plaintiff's interests and continue over time, a cause of action may accrue each time the plaintiff is injured anew." *Id.* (citations omitted). In other words, "[t]he statute of limitations does not only run from a defendant's initial act if the defendant engages in 'conduct which constitutes a continuing violation of the Sherman Act and which inflicts continuing and accumulating harm.'" *Id.* (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (alterations adopted)). This "continuing violation exception most often applies to conspiratorial conduct." *Id.*

"When the continuing violation exception applies, 'an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.'" *Id.* at 268 (citation omitted); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[E]ach overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." (citation omitted)). "An overt act 'is characterized by two elements: (1) it must be a new

the recovery of antitrust damages "even though some undetermined portion of those damages was the proximate result of conduct occurring more than four years prior to the filing of the counterclaim").

and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff.'" *Rite Aid*, 708 F. Supp. 2d at 268 (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 463, 467 (6th Cir. 1996)).

In a refusal-to-deal case such as this one, "[i]f an initial refusal to deal with a party is final, the statute of limitations begins to run and does not restart when the plaintiff makes subsequent unsuccessful efforts to deal with the defendant." *Vitale v. Marlborough Gallery*, No. 93-CV-6276 (PKL), 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994). Here, Plaintiffs filed their initial complaint in this court on February 6, 2019. (Compl.) In order for their claims to be timely, therefore, they must allege that each Defendant committed at least one overt act on or after February 6, 2015.

Plaintiffs' claims against Xinyi are timely. Although Plaintiffs allege that Xinyi stopped selling to OEMGN in 2014, Xinyi did not inform OEMGN that it would no longer sell to it until May 12, 2015. (Am. Compl. ¶¶ 69, 72.) This refusal was not a mere reaffirmation of previous conduct, as Defendants suggest. Rather, it was the first time that OEMGN learned directly from Xinyi why it had not been selling to OEMGN—because of Mygrant—and that it would continue to refuse to do so unless Mygrant "disappear[ed]." (Am. Compl. ¶ 72.) Indeed, before this conversation, Plaintiffs would have been hard-pressed to convincingly allege that Xinyi engaged in a conspiracy to refuse to sell to it because Xinyi had not, in fact, explicitly refused to do so. *Cf. Zenith*, 401 U.S. at 340 (finding that, because the plaintiff could not have recovered for damages had it brought suit for them within four years of the initial act that caused them, it could do so at a later date); *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 403 (S.D.N.Y. 2008) (citing *Zenith* to determine that the plaintiff's claim for damages did not accrue when the claim would have been so speculative as to bar recovery). Construing Plaintiffs'

16

allegations in a light most favorable to them, Xinyi's refusal to deal with OEMGN on May 12, 2015 was not a subsequent refusal at all, but rather, its initial refusal. Plaintiffs' claims accrued against Xinyi, at the earliest, on that date.

Sika presents a more difficult case. Plaintiffs allege:

> In or around early 2014, OEMGN sought to purchase urethane from Sika. In or around January 2014, OEMGN called a Sika sales representative to discuss the status of a pending OEMGN sales account. The Sika representative indicated that Mygrant had "strongarmed" Sika to boycott OEMGN because Mygrant "didn't want anyone dealing with [OEMGN]" and would "flatten anybody" that did. According to the Sika sales representative, Dow Chemical − a competing manufacturer of urethane products − had informed Mygrant that Sika was opening a sales account with OEMGN. The Sika sales representative further indicated that his boss, upon receiving Mygrant's demand to boycott sales to OEMGN, was concerned, because the company "couldn't jeopardize millions of dollars in business" just to sell to OEMGN.

(Am. Compl. ¶ 84.) Thus, unlike Xinyi, Sika explicitly refused to deal with OEMGN, and explained why, well before February 9, 2015. The Amended Complaint's only other allegations against Sika are that it "refused to sell product to OEMGN" after OEMGN contacted it on February 9, 2015 and again on June 28, 2018. (*Id.* ¶¶ 85-86.) Such bare allegations, without more, do not support any conclusion other than that these refusals were reaffirmations of Sika's clear refusal to sell to OEMGN—due to pressure from Mygrant—beginning in 2014.

In arguing to the contrary, Plaintiffs rely on *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 112 (W.D.N.Y. 1997) and *Simon-Whelan v. Andy-Warhol Found. for the Visual Arts, Inc.*, No. 07-CV-6423 (LTS), 2009 WL 1457177 (S.D.N.Y. May 26, 2009). (*See* Opp'n at 28.) That reliance is misplaced. In *Daniel*, the court observed that "Plaintiffs' allegations of [a defendant's] continuing refusal to reopen the practice track . . . are insufficient to support a finding of continuing antitrust conspiracy." *Daniel*, 988 F. Supp. at 121. In that case, however, the plaintiffs—employees or former employees of Defendants—"[also] asserted several

17

additional acts by the hospital Defendants which they allege occurred during the limitations period, including demotions or losses of responsibility, the denial of jobs, raises and promotions, [and] receipt of less remuneration than ABEM certified physicians . . . ." *Id.* (footnote call number omitted). Plaintiffs here have not made any such specific allegations against Sika, but instead have alleged no more than Sika's "continuing refusal" to sell to them since 2014.

The court in *Simon-Whelan* explicitly found that a second refusal to authenticate the plaintiff's painting was an overt act only because "Plaintiff alleges that Defendants not only permitted, but encouraged, him to resubmit the painting with additional documentation and that he suffered additional, distinct injury as a result of the second denial." 2009 WL 1457177, at *7. Plaintiffs here have alleged no such contact from Sika; in fact, in both 2015 and 2018, OEMGN initiated the contact that led to Sika's subsequent refusals to deal with it. (Compl. ¶¶ 85-86.)

Plaintiffs' federal antitrust claims against Sika are therefore time-barred and must be dismissed.

### 3.    The Wholesaler Defendants

There is no dispute that the two Wholesaler Defendants operate at the same level of the market, and thus that any agreement alleged between them is horizontal in nature. Defendants argue, however, that Plaintiffs have not alleged sufficient facts to support an inference that there was such agreement between the Wholesaler Defendants. (Defs. Mem. in Supp. of Mot. ("Mem.") (Dkt. 89) at 7-9; Reply at 1-2.) In support of this argument, Defendants contend that Plaintiffs have offered only "[n]aked conclusions that defendants agreed with one another not to deal with plaintiff," which "are insufficient to state a valid claim under Section 1 of the Sherman Act." (Mem. at 8 (quoting *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 237 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010)) (quotation marks omitted) (alterations

adopted).) This may be an accurate statement of law, but it is an inaccurate characterization of the Amended Complaint.

In response, Plaintiffs point to several specific allegations from the Amended Complaint:

- Interstate's owner, Angelo Marino, bragged about coordinating pricing with Mygrant and labeled OEMGN a "price-cutter" (Am. Compl. ¶ 36);

- In or about January 2014, a sales representative of non-party manufacturer Carlite informed OEMGN that both of the Wholesaler Defendants were starting to apply "significant pressure" to Carlite to stop selling to OEMGN (*id.* ¶ 38);

- In order to "defend [himself] with *two* major customers" and to avoid being "punish[ed]," the Carlite representative demanded a list of OEMGN's suppliers to relay to Mygrant (*id.* ¶¶ 38-40 (emphasis added));

- The Carlite representative further noted Mygrant's intent was to "get competitors out of the area," but that Mygrant's list of acceptable competitors included 'Angelo' [Marino]" (*id.* ¶ 39);

- On June 18, 2014, a Carlite sales representative states that Mr. Marino admitted that Interstate and Mygrant had pressured Vitro to halt its sales to OEMGN and that "[OEMGN is] not going to make it" (*id.* ¶ 44);

- Mr. Marino (of Interstate) proclaimed that OEMGN was a "cancer" because manufacturers would not sell to it and that Mygrant is "pretty successful at making sure that no one sells [to OEMGN]" (*id.*);

- On or around October 20, 2014, Vitro's General Manager informed OEMGN that "both" Mygrant and Interstate had pressured Vitro to stop its sales to OEMGN" (*id.* ¶ 45);

- On or around February 27, 2015, wholesaler AGD admitted to OEMGN that, at the behest of Mygrant and Interstate, "we in the industry are all supposed to unite to . . . keep you out of the business" (*id.* ¶ 66);

- The truckload division of manufacturer PGW refused to sell products to OEMGN despite having previously agreed to do so (*id.* ¶¶ 77-79). In or around May 2016, OEMGN learned that Interstate's owner Mr. Marino personally called PGW to "let [them] have it" and warned PGW that it was "not supposed to be selling" any glass products to OEMGN (*id.* ¶ 79);

19

- In February 2014, wholesaler IAGD offered to "help" OEMGN buy glass. (*Id.* ¶ 81). But in March 2014, after selling OEMGN one part, IAGD terminated the arrangement after "everyone" pressured it not to sell to OEMGN. OEMGN understood "everyone" to include Mygrant and Interstate (*id.*).

(*See* Opp'n at 13-14.) These allegations are mostly indirect, but, notably, include at least one direct allegation: that Interstate's owner "boasted that he has called Mygrant to discuss and dictate the pricing of an aftermarket auto glass product sold by both Mygrant and Interstate" and stated, "we control the board on that [price]." (Am. Compl. ¶ 36.) This allegation—along with several indirect allegations indicating parallel behavior and common motive—plausibly alleges an agreement between the Wholesaler Defendants to boycott OEMGN. *See Gelboim*, 823 F.3d at 782 ("[A]t the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation."). The allegations, moreover, are extremely detailed, including the names of people involved, dates of conversations, and direct quotations. If Plaintiffs' allegations here are insufficient to allege an agreement between the Wholesaler Defendants, the court is not sure what kind of allegations could, as a practical matter, allege such an agreement. *See id.* at 781 ("[C]onspiracies are rarely evidenced by explicit agreements and nearly always must be proven though inferences that may fairly be drawn from the behavior of the alleged conspirators." (quotation marks and citation omitted)).

4. The Manufacturer Defendants

Defendants also argue that the Amended Complaint fails to state a claim against any of the Manufacturer Defendants because it does not allege facts indicating that they entered into an unlawful agreement with both or either of the Wholesaler Defendants. (Mem. at 9-10.) At its core, "[i]dentifying the existence and nature of a conspiracy requires determining whether the evidence 'reasonably tends to prove that the defendant and others had a conscious commitment

to a common scheme designed to achieve an unlawful objective.'" *Apple*, 791 F.3d at 315 (quoting *Monsanto*, 465 U.S. at 764 (alteration adopted)).

As to Vitro, for example, the Amended Complaint alleges that, on October 20, 2014, Vitro's General Manager informed OEMGN that both Wholesaler Defendants had pressured it to stop sales to OEMGN. (Am. Compl. ¶ 45.) Vitro subsequently reduced and, ultimately, cut off all sales to OEMGN sometime in 2015. (*Id.* ¶¶ 45-46.) In late 2015 and early 2016, Vitro's General Manager also told OEMGN that Vitro would not be selling to OEMGN to avoid putting its Mygrant account "at risk" and that a high-level Mygrant employee instructed him not to sell to OEMGN. (*Id.* ¶¶ 47-48.) The court will not repeat them all here, but the Amended Complaint includes similarly detailed and compelling allegations regarding the existence of an agreement between one or both of the Wholesaler Defendants and ATI (*id.* ¶¶ 52-57; 59), Fuyao (*id.* ¶¶ 62, 64-66), and Xinyi (*id.* ¶¶ 72-74). *See supra* Section I.A.2 (discussing Plaintiffs' factual allegations about each Defendant's involvement in the alleged conspiracy). These allegations include information about specific conversations, with quotes, dates, and names of some of the people involved.

Defendants' primary contention is that Plaintiffs' have alleged no more than parallel refusals to deal (*see, e.g.*, Mem. at 21), which would not amount to an antitrust violation, *see Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[T]he Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") (citation and quotation marks omitted) (alteration adopted); *In re Zinc*, 155 F. Supp. 3d at 366 ("[M]erely alleging parallel conduct alone is not sustainable." (citing *Twombly*, 550 U.S. at 556; *Mayor & City Council of Balt.*, 709 F.3d at 135-36)). But, as

Plaintiffs note, the Amended Complaint does not rest solely on its allegations that the Manufacturer Defendants each independently refused to deal with it.

The court finds the Southern District's recent decision in *Keurig* to be particularly instructive. There, the court found the following allegations sufficient to support the inference that a conspiracy existed:

- "[T]hat an 'expansive system of exclusionary and noncompetition agreements is orchestrated by Keurig, and coffee and other beverage brands that enter into a license or manufacturing agreement with Keurig do so with the express knowledge of Keurig's anticompetitive agreements with other competitor roasters and brands'";

- "[T]hat the terms of Keurig's agreements with roasters and brands are well known within the market, and each company would have known that its competitors had entered into these agreements";

- [T]hat "[c]o-conspirators entered into [multi-year exclusionary] agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations"; and

- "[T]hat 'the coffee and beverage brands' agreements not to deal with . . . makers that could otherwise increase their product output and sales revenue and provide a back-up or second manufacturer or the like' can only be explained by a conspiracy to sustain supra-competitive prices . . . by restraining price competition."

*Keurig*, 383 F.Supp.3d at 245.

Plaintiffs have stated strikingly similar allegations here, particularly that the efforts to boycott OEMGN (and the widespread agreement to participate in that boycott) were well known throughout the industry, and that each Manufacturer Defendant would have known that its competitors were falling in line with the Wholesaler Defendants' demands. (*See, e.g.*, Am. Compl. ¶¶ 5, 44, 52, 54, 56-57, 62-66, 73, 79, 81). Such allegations of "conscious parallelism" may be sufficient for the court to infer the existence of a horizontal agreement "when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Mayor &*

22

*City Council of Balt.*, 709 F.3d at 136 (citations omitted). Plaintiffs have alleged such "circumstantial evidence and plus factors" here, including a high level of interfirm communication (*see, e.g.*, Am. Compl ¶¶ 44, 52, 54, 57, 62, 64-66, 74) and that the Manufacturer Defendants each acted against their apparent economic self-interest by refusing to deal with OEMGN. *See Gelboim*, 823 F.3d at 781. This is "enough factual matter (taken as true) to suggest that an agreement was made," *Twombly*, 550 U.S. at 557, and so dismissal is not warranted. *See Keurig*, 383 F. Supp. 3d at 245 ("[P]laintiff is not required to show, at the pleading stage, that the allegations suggesting agreement 'are more likely than not true or that they rule out the possibility of independent action.'" (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)).

\* \* \*

As Plaintiffs have sufficiently alleged that the Wholesaler Defendants orchestrated a group boycott with and among the Manufacturer Defendants, the court finds that they have plausibly alleged a *per se* violation of § 1 of the Sherman Act.

**B.      State Law Claims**

      1.      <u>The Donnelly Act</u>

Because the Donnelly Act has the same four-year statute of limitations as the Sherman Act, *see* N.Y. Gen. Bus. Law § 340(5), Plaintiffs' Donnelly Act claims against Sika are time-barred.

Defendants' only argument in favor of dismissing Plaintiffs' Donnelly Act claims as to the other Defendants is that "dismissal for failure to state a claim under the Sherman Act requires dismissal of the Donnelly Act claims premised upon the same factual allegations." (Mem. at 25.) The court has not dismissed Plaintiffs' federal antitrust claims against any Defendant except

Sika, and so Plaintiffs' Donnelly Act claims against the remaining defendants survive as well. *See Linens of Europe, Inc. v. Best Mfg., Inc.*, No. 03-CV-9612 (GEL), 2004 WL 2071689, at *18 (S.D.N.Y. Sept. 16, 2004) (declining to dismiss the plaintiff's Donnelly Act claim where "Defendants cite[d] no relevant state policies or statutory distinctions between the Sherman and Donnelly Acts that should lead to the Court to analyze [plaintiff's] state antitrust claim differently from its federal claim").

### 2. Tortious Interference

Under New York law, plaintiffs must prove four elements to succeed on a claim for tortious interference with a business relationship: (1) a business relationship between Plaintiffs and a third party (2) that the Defendants knew of and intentionally interfered with (3) solely out of malice or through the use of dishonest, unfair, or improper means (4) thereby injuring Plaintiffs. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006). Plaintiffs have plausibly alleged each of the elements; namely, that Defendants together have intentionally diminished the ongoing business between third party suppliers and OEMGN—and between each of the other Defendants and OEMGN—through coercion. This injured OEMGN because it was unable to readily purchase auto glass. *See Linens of Europe*, 2004 WL 2071689, at *20 (allowing a tortious interference claim to proceed when the plaintiff alleged that a manufacturer "refused to deal with [the plaintiff] at the behest of" its competitors).

In arguing to the contrary, Defendants rely primarily on *Susskind v. Ipco Hosp. Supply Corp.*, 373 N.Y.S. 2d 627, 629 (2d Dep't 1975), an almost forty-five-year-old case, to support their argument that this claim should be dismissed because Plaintiffs have not provided specific allegations of prospective negotiations that reasonably could be expected to result in one or more contracts. (Mem. at 26.) Plaintiffs have plausibly alleged, however, that they would enter into

contracts for the sale of aftermarket auto glass and supplies with the Wholesaler Defendants and with third-party manufacturers. (*See, e.g.*, Am. Compl. ¶¶ 43, 54, 56-57, 125.) This includes allegations that Plaintiffs actually had entered into contracts with, for example, AGO and C-Auto, that were later cancelled as a result of Defendants' pressure. (*Id.* ¶¶ 53-56.) Such allegations are sufficient under New York law to state a claim for tortious interference.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. Plaintiffs' federal and state antitrust claims against Sika are DISMISSED. All of Plaintiffs' other claims—including its tortious interference claim against Sika—survive.

The parties are DIRECTED to contact the chambers of Magistrate Judge Lois Bloom regarding next steps in this case.

SO ORDERED.

*Nicholas G. Garaufis*

Dated: Brooklyn, New York
         January 30, 2020

NICHOLAS G. GARAUFIS
United States District Judge