UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

O.E.M. GLASS NETWORK, INC. and
BROOKLYN WHOLESALE GLASS INC.,

                    Plaintiffs,

      -against-

MYGRANT GLASS COMPANY, INC., et al.,

                    Defendants.

**MEMORANDUM & ORDER**
19-CV-00742 (NGG) (LB)

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs O.E.M. Glass Network, Inc., and Brooklyn Wholesale Glass Inc. (collectively "OEMGN" or "Plaintiffs") bring antitrust claims against Defendants Mygrant Glass Company, Inc. ("Mygrant"), Auto Temp Inc. ("ATI"), and Interstate Glass of Amityville NY, LLC, Metro Glass Distributing, Inc. ("Interstate") (collectively "Defendants."). (*See* Defs.' Mot. f. Sum. J. ("Defs.' Mot.") (Dkt. 185) at 1; Pls.' Mot. f. Sum. J. ("Pls.' Mot.") (Dkt. 183) at 1.) Plaintiffs allege that Defendants entered into an illegal conspiracy to put OEMGN, a wholesaler of aftermarket auto glass, out of business by orchestrating a group boycott among OEMGN's suppliers. (Pls.' Mot. at 1.) They now seek partial summary judgment as to Defendants' liability for *per se* violation of § 1 of the Sherman Act. (*Id.*) Defendants also seek summary judgment, or in the alternative summary adjudication, on Plaintiffs' damages from two unopened warehouses and on Plaintiffs' § 1 claim more generally. (Defs.' Mot. at 18.)

For the foregoing reasons, Plaintiffs' motion is DENIED and Defendants' motion is also DENIED.

1

# I.   BACKGROUND

## A.   Industry

Aftermarket auto glass is used to replace damaged glass in vehicles. (Pls.' 56.1 St. (Dkt. 183-2) at ¶ 1; Defs.' Resp. to Pls.' 51.6 St. ("Defs.' 56.1 Resp.") (Dkt. 187-1) at ¶ 1.) Other forms of glass are not substitutes for auto glass and cannot be used for this purpose. (Pls.' 56.1 St. at ¶ 3; Defs.' 56.1 Resp. at ¶ 3.) Aftermarket auto glass manufacturers deliver glass parts directly to end customers or to wholesalers. (Pls.' 56.1 St. at ¶ 4; Defs.' 56.1 Resp. at ¶ 4.) There are a limited number of auto glass manufacturers, including ATI, Vitro, S.A.B. de C.V., Vitro Automotive Glass LLC, and Vitro Automotive S.A. de C.V. (collectively "Vitro"), Xinyi Auto Glass North America Corporation ("Xinyi"), Shenzhen Benson Automobile Glass Co., Ltd. ("Benson"), Fuyao Glass America Inc. ("Fuyao"), Saint-Gobain, Carlex Glass America ("Carlex"), Asahi Glass Company ("AGC"), and Pilkington. (Pls.' 56.1 St. at ¶ 6; Defs.' 56.1 Resp. at ¶ 6.) Aftermarket auto glass wholesalers purchase auto glass parts and related products and sell them to retailers, who then install the glass in end-user's vehicles. (Pls.' 56.1 St. at ¶ 8; Defs.' 56.1 Resp. at ¶ 8.) Some manufacturers also operate as wholesalers. (Pls.' 56.1 St. at ¶ 7; Defs.' 56.1 Resp. at ¶ 7.)

The parties do not dispute that the relevant product market in this case is sales from wholesalers of aftermarket auto glass products to retailers. (Pls.' 56.1 St. at ¶ 250; Defs.' 56.1 Resp. at ¶ 250.) Nor do they dispute that the relevant geographic market is the New York Metropolitan Area, which includes New York, Kings, Queens, Bronx, Richmond, Nassau, and Suffolk counties in New York. (Pls.' 56.1 St. at ¶ 251; Defs.' 56.1 Resp. at ¶ 251.)

## B.   Parties

Plaintiffs O.E.M. Glass Network, Inc. and Brooklyn Wholesale Glass Inc. operate collectively as "Brooklyn Wholesale," a

wholesaler of auto glass parts and related products. (Pls.' 56.1 St. at ¶¶ 15-19; Defs.' 56.1 Resp. at ¶¶ 15-19.) The company began operating in January 2014, with both corporate entities wholly owned by Tom Barsch Jr. ("Tom Jr."). (Pls.' 56.1 St. at ¶¶ 16, 21; Defs.' 56.1 Resp. at ¶¶ 16, 21.)

Defendant Mygrant is a California corporation with its principal place of business in Hayward, California. (Pls.' 56.1 St. at ¶ 25; Defs.' 56.1 Resp. at ¶ 25.) Mygrant is a wholesaler of auto glass parts and related products that operates 86 warehouses around the country, including in Brooklyn, New York; the Bronx, New York; and Belleville, New Jersey. (Pls.' 56.1 St. at ¶¶ 25, 28; Defs.' 56.1 Resp. at ¶¶ 25, 28.)

Defendant Interstate is a wholesaler of auto glass parts and related products located in Copiague, New York. (Pls.' 56.1 St. at ¶ 31; Defs.' 56.1 Resp. at ¶ 31.)[1] Interstate operates warehouses in Copiague, New York and Maspeth, Queens. (Pls.' 56.1 St. at ¶ 36; Defs.' 56.1 Resp. at ¶ 36.)

Defendant ATI is an Ohio-based manufacturer of aftermarket auto glass products. (Pls.' 56.1 St. at ¶ 38; Defs.' 56.1 Resp. at ¶ 38.) ATI also has "wholesale" operations whereby it buys auto glass from other manufacturers and resells the glass to its customers. (Pls.' 56.1 St. at ¶ 41; Defs.' 56.1 Resp. at ¶ 41.)

## C.  Relevant Non-Parties

There are also various non-party manufacturers allegedly involved in the boycott against OEMGN. AGC is a Japanese multinational company whose subsidiary AGC Automotive Americas manufacturers and distributes auto glass produces throughout the United States. (Pls.' 56.1 St. at ¶ 49; Defs.' 56.1 Resp. at ¶ 49.) Carlex is a manufacturer of original equipment glass that is

---

[1] Metro Glass Distributing, Inc. is not currently in operation. (Pls.' 56.1 St. at ¶ 31; Defs.' 56.1 Resp. at ¶ 31.)

used in newly manufactured vehicles and as aftermarket replacement glass. (Pls.' 56.1 St. at ¶ 50; Defs.' 56.1 Resp. at ¶ 50.) Fuyao is a manufacturer of aftermarket auto glass products located in China. (Pls.' 56.1 St. at ¶ 51; Defs.' 56.1 Resp. at ¶ 51.) Pilkington is a manufacturer and wholesaler of aftermarket auto glass products. (Pls.' 56.1 St. at ¶ 52; Defs.' 56.1 Resp. at ¶ 52.) Saint-Gobain was a manufacturer of aftermarket auto glass products through its subsidiary Autover. (Pls.' 56.1 St. at ¶ 53; Defs.' 56.1 Resp. at ¶ 53.) Saint-Gobain closed its North American operations in 2018, after which Mygrant acquired Saint-Gobain's warehouse and hired its former employees. (*Id.*) Sika is a manufacturer of urethane, which is used in the installation of aftermarket auto glass products, with American operations based in Lyndhurst, New Jersey. (Pls.' 56.1 St. at ¶ 54; Defs.' 56.1 Resp. at ¶ 54.) Vitro is a manufacturer of aftermarket auto glass products. (Pls.' 56.1 St. at ¶ 55; Defs.' 56.1 Resp. at ¶ 55.) Xinyi, also known as XYG, and Benson are two manufacturers of aftermarket auto glass products located in Ontario, Canada. (Pls.' 56.1 St. at ¶¶ 56-57; Defs.' 56.1 Resp. at ¶¶ 56-57.) Xinyi and Benson are both subsidiaries of Xinyi Glass Holdings, Ltd., which is headquartered in Hong Kong, China. (Pls.' 56.1 St. at ¶¶ 56-57; Defs.' 56.1 Resp. at ¶¶ 56-57.)

There are also a number of non-party wholesalers relevant to the allegations. American Glass Distributors, American Houston Group, and AGTL, LLC (collectively "AGD") are ▮▮▮▮▮▮ wholesalers of aftermarket auto glass products. (Pls.' 56.1 St. at ¶ 58; Defs.' 56.1 Resp. at ¶ 58.) AGTL sells auto glass ▮▮▮▮▮ while American Houston Group only sells to retail customers in the Houston area. (*Id.*) AGO, also known as Auto Glass Warehouse, is an auto glass wholesaler located in Maryland. (Pls.' 56.1 St. at ¶ 60; Defs.' 56.1 Resp. at ¶ 60; Pls.' 56.1 Reply (Dkt. 189-

1) at 6.)[2] Cleveland Auto Glass Supply Company ("C-Auto") is a glass wholesaler located in Cleveland, Ohio. (Pls.' 56.1 St. at ¶ 61; Defs.' 56.1 Resp. at ¶ 61.) IAGD is an auto glass wholesaler located in the Bronx, New York. (Pls.' 56.1 St. at ¶ 62; Defs.' 56.1 Resp. at ¶ 62.) National Glass Brokers is a bulk distributor of aftermarket auto glass that sells to customers nationwide. (Pls.' 56.1 St. at ¶ 63; Defs.' 56.1 Resp. at ¶ 63.) PGW is a wholesaler of aftermarket auto glass that sells through two separate divisions: a "branch" division and "truckload" division. (Pls.' 56.1 St. at ¶ 64; Defs.' 56.1 Resp. at ¶ 64; Pls.' 56.1 Reply (Dkt. 189-1) at 9.) Sales through PGW's truckload division typically consist of larger quantities of glass at lower prices. (Pls.' 56.1 St. at ¶ 241; Defs.' 56.1 Resp. at ¶ 241.)

### D. Events

The relevant events began in May 2013 when Mygrant acquired assets from Wholesale Glass Distributors ("WGD"), a competing wholesaler of aftermarket auto glass then owned by Tom Barsch, Sr. ("Tom Sr."). (Pls.' 56.1 St. at ¶¶ 68-70; Defs.' 56.1 Resp. at ¶¶ 68-70.) As part of the deal, Mygrant purchased inventory from WGD's locations in New York and New Jersey and hired Tom Sr. to work at Mygrant. (Pls.' 56.1 St. at ¶¶ 68, 72; Defs.' 56.1 Resp. at ¶¶ 68, 72.) Tom Sr. agreed to the acquisition due in part to ▮▮▮▮▮▮ and his desire to exit the industry. (Defs.' 56.1 St. (Dkt. 185-2) at ¶ 32; Pls.' Resp. to Defs.' 56.1 St. ("Pls.' 56.1 Resp.") (Dkt. 186-1) at ¶ 32.) Tom Jr. also performed work for Mygrant between June 2013 and August 2013 but was not an official employee of the company. (Pls.' 56.1 St. at ¶ 74; Defs.' 56.1 Resp. at ¶ 74.) Tom Jr. rebuffed multiple job offers

---

[2] In some instances, as here, the Defendants' objection to a fact asserted in Plaintiffs' 56.1 Statement is undermined by Plaintiffs' 56.1 Reply. In these instances, the court accepts the asserted fact and does not consider it to be genuinely disputed.

from Mygrant during this period. (Pls.' 56.1 St. at ¶ 76; Defs.' 56.1 Resp. at ¶ 76; Pls.' 56.1 Reply at 11-12.)

In January 2014, Tom Jr. opened OEMGN out of a warehouse at 152 6th Street in Brooklyn, New York—the same location where Tom Sr. had run WGD. (Defs.' 56.1 St. at ¶¶ 3-4; Pls.' 56.1 Resp. at ¶¶ 3-4.) OEMGN competed with Defendants Mygrant and Interstate. (Pls.' 56.1 St. at ¶¶ 86-87; Defs.' 56.1 Resp. at ¶¶ 86-87.) Tom Sr. was then fired from Mygrant in January 2014 and began to work at OEMGN in February 2014. (Defs.' 56.1 St. at ¶¶ 53-54; Pls.' 56.1 Resp. at ¶¶ 53-54.) Around this time, Mike Mygrant exhibited clear animosity toward OEMGN. (*See, e.g.*, Pls.' 56.1 St. at ¶ 93; Defs.' 56.1 Resp. at ¶ 93.)[3]

From here the parties diverge in their telling of the events.

### 1.  Plaintiffs' Narrative[4]

According to Plaintiffs, OEMGN posed a competitive threat in the industry because it provided faster deliveries, better service, and lower prices. (Pls.' 56.1 St. at ¶¶ 82-84.) Concerned about this potential threat, Mygrant tried to size up OEMGN and identify its suppliers even before the company opened. (*Id.* at ¶¶ 89-91.) To that end, Mike Mygrant emailed Carlex's National Sales Manager in January 2014 to ask if Carlex was supplying OEMGN. (*Id.* at ¶¶ 92-95.) After expressing anger that Carlex was doing so, Mygrant demanded that Carlex find out which manufacturers were supplying OEMGN (*Id.* at ¶¶ 99-103.) Interstate

---

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Pls.' 56.1 St. at ¶ 26; Defs.' 56.1 Resp. at ¶ 26.)

[4] In this section and the "Defendants' Narrative" section, the court cites factual assertions made in 56.1 Statements that may rely on inadmissible hearsay. The court does not rely on such assertions in weighing the parties' motions for summary judgment. It merely notes them in the context of the parties' proffered narratives.

made similar demands of Carlex. (*Id.* at ¶¶ 106-07.) Carlex responded by calling Tom Jr. and demanding a list of OEMGN's suppliers, which Tom Jr. ultimately gave. (*Id.* at ¶¶ 103-05.) Michael Mygrant also pressured Xinyi to disclose information about OEMGN and expressed his frustration about the new competitor to AGC. (*Id.* at ¶¶ 108-09.)

Mygrant's William Weingart shared similar concerns with Sika's Territory Manager, Brian Weissberg, in January 2014. (*Id.* at ¶¶ 111-13.) On April 13, 2014, Sika informed OEMGN that it could not supply the company with aftermarket auto glass "due to political reasons." (*Id.* at ¶ 114.) Sika representatives indicated to Tom Jr. that Mygrant was pressuring Sika not to sell to OEMGN. (*Id.* at ¶¶ 116-20.)

Plaintiffs allege that Mygrant and Interstate thereafter entered into an agreement to cut off OEMGN's supply of aftermarket auto glass. (*Id.* at 28.) This agreement was purportedly discussed during a March 4, 2014 meeting between Mygrant's Paul Anaya and William Weingart and Interstate's Angelo Marino at the Vegas Diner in Brooklyn, New York. (*Id.* at ¶¶ 125-26.) Though no arrangement was memorialized at the meeting, both Mygrant and Interstate contacted manufacturers about OEMGN shortly thereafter. (*Id.* at ¶ 29.) On March 5, 2016, Mygrant's Paul Anaya wrote to Benson's CT Chan about supplying OEMGN. (*Id.* at ¶ 127.) Mr. Chan then told Benson employees that the company should not sell to OEMGN and later assured Paul Anaya that Benson would not do so. (*Id.* at ¶¶ 130-34.) On March 6, 2014, Interstate's Patricia Walsh wrote to Vitro's Eduardo Rivera asking if Vitro had been contacted by Tom Sr. (*Id.* at ¶ 135.) Vitro employees reacted to this communication with concern that Interstate was upset about Vitro's sales to OEMGN. (*Id.* at ¶ 136.) On November 12, 2014, William Weingart emailed Paul Anaya to say that Angelo Marino had asked Weingart if Mygrant could stop Pilkington from selling to OEMGN. (*Id.* at ¶

7

141.) Marino noted that he had already stopped another distributor, PGW, from selling to OEMGN. (*Id.*)

Mygrant and Interstate also grew closer during this period. Mygrant put Interstate on "Open Account Terms" on March 20, 2014, allowing Interstate to purchase from Mygrant on credit rather than cash upon delivery (*Id.* at ¶¶ 137-38.) The two also communicated about driving another competing wholesaler out of town, Mygrant opening a warehouse in Long Island, raising prices on aftermarket auto glass, and Mygrant potentially acquiring Interstate. (*Id.* at ¶¶ 146-52.)

Plaintiffs further assert that Defendants' illicit scheme to pressure manufacturers and wholesalers not to sell to OEMGN was highly effective. Mygrant pressured Xinyi to stop selling to OEMGN from March 2014 to August 2014. (*Id.* at ¶¶ 156-60.) Xinyi ultimately stopped selling to OEMGN due to pressure from Mygrant. (*Id.* at ¶¶ 155, 161.) Interstate pressured Vitro to stop selling to OEMGN in March 2014 and Vitro did so later that month. (*Id.* at ¶¶ 165-67.) Mygrant also successfully pressured Benson not to sell to OEMGN and to cut off supply of Benson branded glass to National Glass Brokers, a wholesaler that sold Benson products to OEMGN. (*Id.* at ¶¶ 177-87.) Saint-Gobain sold glass to OEMGN from October 2013 through early 2016, but eventually refused to continue selling due to pressure from Mygrant. (*Id.* at ¶¶ 201-206.) PGW's branch division began selling glass to OEMGN in August 2014, though Interstate's Angelo Marino tried to pressure PGW to stop these sales in 2016. (*Id.* at ¶¶ 242-49.) OEMGN was also unable to buy glass from IAGD in March 2014. (*Id.* at ¶¶ 236-40.)

ATI similarly refused to sell aftermarket auto glass to OEMGN due to pressure from Mygrant. (*Id.* at. ¶¶ 220-22.) ATI itself also pressured other suppliers not to sell to OEMGN. This was demonstrated by AGD wanting to avoid selling ATI-branded glass directly to New York, due to concern of angering ATI. (*Id.*

at ¶¶ 208-10.) Steve Gross, a representative for AGTL, LLC, later told Tom Jr. that AGD "got threatened by Mygrant" who did not want sales to OEMGN. (*Id.* at ¶ 217.) AGO would also not sell ATI branded glass to OEMGN in January and February 2014 after receiving pressure from ATI representatives and Mygrant's Paul Anaya. (*Id.* at ¶¶ 223-26.) Mygrant's Paul Anaya later recounted his conversation with AGO's Ehsan Ghavamifard, stating "I threatened him with jihad if he sells one vent of glass to [Brooklyn] Wholesale." (*Id.* at ¶ 225.) C-Auto refused to sell ATI branded auto glass to OEMGN in January 2014 after ATI's Doug Fassler stated that he would get in trouble if such sales were made. (*Id.* at ¶¶ 229, 233-35.)

On the whole, Plaintiffs paint a picture of the Defendants agreeing to work together to pressure aftermarket auto glass manufacturers and wholesalers not to sell to OEMGN and ultimately succeeding in doing so.

### 2. Defendants' Narrative

By Defendants' telling, manufacturers and wholesalers independently refused to sell to OEMGN due to the company's poor reputation, its haphazard management, and supply constraints inherent to the aftermarket auto glass market.

They argue that Tom Jr. founded OEMGN after disagreeing with his father's decision to sell WGD assets to Mygrant. (Defs.' 56.1 St. at ¶ 40.) He then started OEMGN by re-letting his father's old warehouse, obtaining a startup loan of $400,000 from his mother, and utilizing warehouse equipment that Mygrant had left behind after the WGD acquisition. (*Id.* at ¶¶ 44-47.) Mygrant fired Tom Sr. in 2014 after discovering that he was providing proprietary information to OEMGN and soliciting Mygrant customers on behalf of Tom Jr. (*Id.* at ¶ 53.)   It subsequently contacted suppliers of aftermarket glass to ascertain the scope of the breach in "business ethics" by Tom Sr. while he was employed at Mygrant. (Defs.' 56.1 Resp. at 140-41.)

9

Defendants also claim that Tom Sr. had a poor reputation in the industry and that Tom Jr. operated OEMGN in the same unethical, sloppy way as his father had long conducted business. (*Id.* at ¶¶ 56-66.) Tom Jr. was unable to secure suppliers because he was not credit-worthy and refused to sign personal guarantees. (*Id.* at ¶¶ 67,70.) Saint-Gobain stopped selling to OEMGN because of a negative credit report, Sika stopped selling to OEMGN when its account went inactive, and other manufacturers refused to sell to OEMGN due to difficulties of working with Tom Jr. and Tom Sr. (*Id.* at ¶¶ 71-77.) Manufacturers such as Vitro, Fuyao, and ATI were also unable to sell to OEMGN due to capacity constraints, which are a matter of course in the aftermarket glass industry. (*Id.* at ¶¶ 85-89.)

To that end, it is unclear when, if ever, suppliers stopped selling to OEMGN as a result of the purported boycott. (*Id.* at ¶¶ 92-93.) Rather, OEMGN purchased glass from manufacturers Xinyi, PGW, Pilkington, Saint-Gobain, Carlex, Vitro, AGC Automotive Americas, Sika Corporation, and Dow Chemicals, as well as third-party wholesalers Auto Glass Outlet, C-Auto Glass, WGD of South Carolina, National Glass Brokers, K-International, Guardian Automotive Products, GGG, Burco Inc., Kings Automotive Group, Kryger Glass, and Curved Glass during the alleged conspiracy period. (*Id.* at ¶ 6.) It is also unclear which sales, if any, OEMGN lost due to insufficient supply stemming from the purported boycott. (*Id.* at ¶¶ 94-95.)

According to Defendants, OEMGN did not falter because of any anticompetitive malfeasance, but because of its own business failures and the challenges of the aftermarket auto glass industry.

## II. LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[5] "While the party seeking summary judgment always bears the burden of demonstrating the absence of a genuine issue of material fact, that party may do so by pointing out that the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to that party's case." *eCommission Sols., LLC v. CTS Holdings, Inc.*, 860 F. App'x 758, 759 (2d Cir. 2019) (summary order) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant's burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly and Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The "opponent must do more than simply show that there is some metaphysical doubt as to the material facts;" they must instead put forth "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"In determining whether summary judgment is appropriate, [a court] will construe the facts in the light most favorable to the

---

[5] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

11

non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).[6] "[S]ummary judgment is not an all-or nothing proposition." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 334 (E.D.N.Y. 2019). "A party may move pursuant to Rule 56(a) for summary judgment as to an entire claim or defense, as well as part of a claim or defense." *Id.*

"By avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces, summary judgment serves a vital function in the area of antitrust law." *Tops Mkts, Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998).

## III. DISCUSSION

### A. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on their claim that Defendants engaged in a *per se* illegal horizontal group boycott in violation of § 1 of the Sherman Act. (Pls.' Mot. at 28.) The parties contest whether the alleged conduct should receive *per se*

---

[6] A district court can only consider admissible evidence in deciding whether to award summary judgment. Fed. R. Civ. P. 56(c)(2); *see also Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004); *In re Vitamin C Antitrust Litig.*, Nos. 06-MD-1738 (BMC)(JO), 05-CV-0453, 2013 WL 504257 (BMC)(JO), at *4 (E.D.N.Y. Feb. 8, 2013); *Figueroa*, 825 F.3d at 98 n.8. Consideration of evidence at this stage does not, however, mean that the evidence is definitively admissible at trial. The parties retain the right to submit evidentiary motions before trial. The court will, for now, consider all expert reports to be presumptively admissible and presumes that all out-of-court statements made by a Defendant's employee and offered by Plaintiffs are presumptively admissible as party-opponent statements under Federal Rule of Evidence 801(d)(2)(D).

treatment,[7] whether summary judgment is precluded by Plaintiffs' failure to show antitrust injury, and whether Plaintiffs have shown that there was a horizontal agreement to boycott OEMGN.

For the foregoing reasons, the court DENIES Plaintiffs' motion. [8]

### 1. *Per Se* Versus Rule of Reason

The Supreme Court "has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 290 (1985).[9] Yet "[t]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." *Id.* at 294.

---

[7] At the motion to dismiss stage, this court noted that the Plaintiffs "have plausibly alleged *a per se* violation of § 1 of the Sherman Act." *O.E.M. Glass Network, Inc. v. Mygrant Glass Co.*, 436 F. Supp. 3d 756, 594 (E.D.N.Y. 2020). The court now addresses this point in greater detail.

[8] The remaining Defendants in the suit are Mygrant, Interstate, and ATI. (Pls.' Mot. at 1.) Other Defendants named in the Amended Complaint are no longer participants. (*See* Dkts. 138, 156, 166, 173.)

[9] When assessing whether an agreement violates § 1 of the Sherman Act, courts "presumptively appl[y a] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). However, "agreements whose nature and necessary effects are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality . . . are 'illegal per se'." *Nat'l Soc'y of Pro. Engineers v. United States*, 435 U.S. 679, 692 (1979). Such agreements are "presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northwest Wholesale Stationers*, 472 U.S. at 289 (citing *N. Pac. R.R. Co. v. United States*, 356 U.S. 1, 5 (1958)).

In *Klor's Inc. v. Broadway-Hale Stores, Inc.*, the Supreme Court declared that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category" and that "[t]hey have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they fixed or regulated prices, parcel[]ed out or limited production, or brought about a deterioration in quality." 359 U.S. 207, 212 (1959).

The *per se* treatment prescribed in *Klor's* has since been cabined to group boycotts that have a horizontal component. "Agreements within the scope of § 1 may be either horizontal, *i.e.*, agreements between competitors at the same level of the market structure, or vertical, *i.e.*, combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors." *Anderson News, L.L.C., v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (citing *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972)). "*Klor's* was a case involving not simply a 'vertical' agreement between supplier and customer, but a case that also involved a 'horizontal' agreement among competitors . . . . [P]recedent makes the *per se* rule inapplicable [here], for the case before us concerns only a vertical agreement and a vertical restraint." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109-10 (2d Cir. 2002) (denying *per se* treatment because the plaintiff had failed to "adduce any evidence of a horizontal agreement"); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 934 (7th Cir. 2000) ("The critical question here is whether . . . there was a horizontal agreement among the toy manufacturers, with [the defendant] in the center as the ringmaster, to boycott the warehouse clubs."); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 462 (3d Cir. 1998) (applying *per se* treatment to a boycott conspiracy with "a number of horizontal competitors involved").

The Supreme Court in *Northwest Wholesale Stationers* weighed certain factors before applying *per se* treatment to a group boycott. "Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." 472 U.S. at 294. In these cases, (1) "the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete;" (2) "frequently the boycotting firms possessed a dominant position in the relevant market;" and (3) the conduct was not justified by "plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* Each factor need not be met to merit *per se* treatment. *Id.* at 295. Courts in this circuit have considered the *Northwest Wholesale Stationers* factors before applying *per se* treatment to horizontal group boycotts. *See Pharmacy-Checker.com, LLC v. Nat'l Assoc. of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 344 (S.D.N.Y. 2021); *Flash Elec., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 388 (E.D.N.Y. 2004); *Klickads, Inc. v. Real Est. Bd. of N.Y., Inc.*, No. 04-CV-8042 (LBS), 2007 WL 2254721, at *6 (S.D.N.Y. Aug. 6, 2007); *see also Rossi*, 156 F.3d at 464.

Defendants make great hay of whether OEMGN can fairly be called a "price-cutter." (Defs.' Opp. (Dkt. 187) at 17-18.) But courts in this circuit have not required a showing that the excluded party is a price cutter in order for *per se* treatment to apply. *See, e.g., PharmacyChecker.com, LLC*, 530 F. Supp. 3d at 344 (considering the *Northwest Wholesale Stationers* factors in applying *per se* treatment, rather than whether the excluded party was a price cutter); *Med. Diagnostic Imaging, PLLC v. CareCore Nat'l, LLC*, No. 06-CV-7764 (WWE), 2010 WL 11715050, at *6 (E.D.N.Y. Oct. 21, 2010) (same). Even in *Rossi v. Standard Roofing, Inc.*, a case much cited by Defendants, (*id.*

at 17), the application of *per se* liability was not a function of the excluded competitor being a price cutter. Instead, the *Rossi* court relied on the existence of horizontal agreements to exclude a competitor and the *Northwest Wholesale Stationers* factors being met. 156 F.3d at 462-64.

Mygrant and Interstate are two competitors alleged to have conspired together against Plaintiffs through an agreement to engage in a pressure campaign. Thus, the alleged conspiracy contains a horizontal component—the agreement between Mygrant and Interstate to engage in a pressure campaign—as well as vertical components—agreements between the Defendant wholesaler and manufacturers of aftermarket auto glass not to sell to OEMGN. [10] Due to the presence of a horizontal agreement, *per se* treatment applies so long as the *Northwest Wholesale Stationers* factors are met. [11] The court considers these below.

---

[10] Though ATI also had wholesale operations, ▮▮▮▮▮▮▮ of its revenue came from its manufacture and sale of aftermarket auto glass. (Pls.' 56.1 St. at ¶¶ 40-41; Defs.' 56.1 Resp. at ¶¶ 40-41.) Further, Plaintiffs assert that OEMGN competed with Mygrant and Interstate but do not make similar claims regarding ATI. (Pls.' 56.1 St. at ¶¶ 85-87.) ATI was therefore primarily an upstream supplier vertical to Mygrant, Interstate, and OEMGN. ATI would still, however, be subject to liability on a *per se* horizontal group boycott claim. Courts have found that upstream suppliers that participated in a horizontal group boycott scheme are also subject to liability on a *per se* basis. *See, e.g., Rossi*, 156 F.3d at 457, 464 (applying *per se* treatment to a manufacturer who participated in a distributor-led boycott of a competing distributor).

[11] Notwithstanding the centrality of the *per se* scrutiny issue, neither party deals with *Northwest Wholesale Stationers* factors adequately in their briefing. Defendants acknowledge that these factors bear on whether to apply *per se* treatment to group boycotts, (Defs.' Opp. at 14), but do not expand on whether these factors are met. The Plaintiffs imply that *Northwest Wholesale Stationers* is cabined to cases involving purchasing cooperatives or procompetitive justifications. (Pls.' Reply (Dkt. 189) at 4.) Yet, the *Northwest Wholesale Stationers* factors have been applied outside of the purchasing cooperative context. *See, e.g., PharmacyChecker.com*, 530 F.

a.    Access to Supply

The first *Northwest Wholesale Stationers* factor requires con-
sideration of whether the boycott in question cut off access to a
supply, facility, or market necessary to enable the boycotted firm
to compete. 472 U.S. at 294. This factor does not, however, re-
quire a showing that the harmed party was "*completely* cut off"
from "access to the inputs it needs" because "businesses that can
obtain those inputs only on unfavorable terms are unlikely to be
able to compete." *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th
824, 835-36 (9th Cir. 2022) (citing *Nw. Wholesale Stationers*, 472
U.S. at 295 n.6) (emphasis added).

The alleged conspiracy involved a coordinated effort be-
tween Mygrant and Interstate to pressure suppliers of
aftermarket auto glass not to sell to OEMGN. There is no doubt
that supply of aftermarket auto glass is necessary to enable a
wholesaler to compete. (Pls.' 56.1 St. at ¶ 9; Defs.' 56.1 Resp. at
¶ 9.) Mygrant's Paul Anaya stated in deposition that "inventory
availability is everything in our business and we really try to at-
tract our customers on the basis that they can make one call and
they could get all of their glass needs from one location."
(SUMFEX 7 to Kovacs Decl. (Dkt. 183-4) at ECF 154.)  It is also
clear that OEMGN was able to obtain some supply of aftermarket
auto glass during the conspiracy period. Plaintiffs' merits expert
Dr. Ketan Patel showed that OEMGN purchased approximately
$6 million in aftermarket auto glass during the conspiracy period.
(Ex. 38 to MacKay Decl. ("Patel Report") (Dkt. 185-9) at ECF
218.)

But the relevant question is whether the purported boycott
limited supply to the extent that OEMGN's competitiveness was

---

Supp. 3d at 344; *Rossi*, 156 F.3d at 464. And while the presence of pro-
competitive rationales is one such factor, the absence of a rationale does
not bar application of the factors altogether.

diminished, not whether OEMGN was absolutely deprived of supply. *See PLS.com*, 32 F.4th at 835-36. There is substantial evidence that this was the case. On June 5, 2015, Mygrant's Paul Anaya emailed other Mygrant employees, including, Mike Mygrant, stating that "I heard tonight from Angelo that Tom . . . he's having difficulty sourcing glass from anyone, this seems to be slowing him" (Pls.' 56.1 St. at ¶ 140; Defs.' 56.1 Resp. at ¶ 140.). Other Mygrant emails acknowledge that OEMGN was unable to purchase glass from certain suppliers, such as AGO. (*See, e.g.*, Pls.' 56.1 St. at ¶¶ 224-25; Defs.' 56.1 Resp. at ¶¶ 224-25.) Mygrant's Paul Anaya appeared to recognize in a 2018 email that if Benson "stop[ped] supporting National Glass Brokers," a wholesaler that supplied OEMGN, this would "make it harder on Tommy." (Pls.' 56.1 St. at ¶ 186; Defs.' 56.1 Resp. at ¶ 186.)[12]

The supply that OEMGN was able to obtain also rendered it at a competitive disadvantage. Dr. Patel agrees with Defendants' expert, Dr. Celeste Savaria, that OEMGN purchased aftermarket auto glass predominately from other wholesalers rather than from manufacturers. (Patel Report at ECF 218; Ex. 42 to MacKay Decl. ("Savaria Report") (Dkt. 185-9) at ECF 467-68.)[13] The parties agree that wholesalers would generally rather purchase from

---

[12] In response to a 2014 email from Paul Anaya about AGO not selling to OEMGN, Mike Mygrant stated "Glass will most likely be in short supply for the next 6 months." (Pls.' 56.1 St. at ¶ 224; Defs' 56.1 Resp. at ¶ 224.) It is not entirely clear what Mike Mygrant meant by this statement, but it is possible he was suggesting that OEMGN lacked adequate supply to compete due to the group boycott.

[13] For example, OEMGN purchased $2.4 million of its total $6 million in glass from a collection of wholesalers. It purchased $1 million from PGW's more expensive branch division, and $0.8 million from AGC Automotive. Though there are reliability issues with OEMGN's internal data, (*see* Defs.' 56.1 St. at ¶ 9; Pls.' 56.1 Resp. at ¶ 9), the conclusion that its purchases came predominately from wholesalers is likely robust given the extent to which purchases from wholesalers outweighed those from manufacturers in the purchase data, notwithstanding incorrect data entries.

manufacturers due to increased pricing, shipping costs, longer lead-times, and limitations on product offerings when buying from other wholesalers. (Pls.' 56.1 St. at ¶ 10; Defs.' 56.1 Resp. at ¶ 10; Pls.' 56.1 Reply at 6.) To this point, Dr. Patel showed that wholesalers who buy from other wholesalers have narrower profit margins and reduced ability to offer lower prices than wholesalers who purchase from manufacturers. (Ex. 39 to Mac-Kay Decl. ("Patel Reply") (Dkt. 185-9) at ECF 264-65.) Whatever supply of auto glass OEMGN was able to obtain was therefore of a fundamentally different character than its competitors such that OEMGN was at a "severe competitive disadvantage." *See Nw. Wholesale Stationers*, 472 U.S. at 295 n.6.

The court therefore concludes that this factor is met.

### b.      Dominant Market Position

The second *Northwest Wholesale Stationers* factor is whether the boycotting firm, or firms, possessed a dominant position in the relevant market during the alleged conspiracy period. 472 U.S. at 294. The Seventh Circuit in *Toys "R" Us* concluded that this factor was satisfied upon a showing of market power. 221 F.3d at 936-37. "The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects." *Id.* at 937; *see also Tops Mkts.*, 142 F.3d at 98. Direct evidence of anticompetitive effects entails "the finding of actual, sustained adverse effects on competition" in the relevant product and geographic markets. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). This includes a showing of sustained price increase, quantity decrease, or quality degradation due to exertion of market power. *MacDermid Printing Sols. LLC v. Corton Corp.*, 833 F.3d 172, 183 (2d Cir. 2016); *see also Toys "R" Us*, 221 F.3d at 937 (finding direct evidence where output was reduced and prices were elevated). "The other, more conventional way [of proving market power], is by proving relevant product and geographic markets and by showing that the

defendant's share exceeds whatever threshold is important for the practice in the case." *Toys "R" Us*, 221 F.3d at 936-37.

Dr. Patel purports to show direct evidence of market power on the basis of quality degradation. In the wake of OEMGN's failure, he argues, quality-based competition decreased in the industry because OEMGN had previously provided differentiated services. (Patel Reply at ECF 239.) "Brooklyn Wholesale's exit from the market, and the resulting unavailability of the differentiated services it offered," he argues, "is equivalent to an increase in the price of aftermarket auto glass in the relevant market." (Patel Reply at ECF 270.) Dr. Savaria doubts this conclusion, arguing that it relies on incorrect assumptions. (Savaria Report at ECF 448.)

There is some reason to doubt Dr. Patel's conclusion on direct evidence of market power. Dr. Patel argues that competition in the aftermarket auto glass market was harmed by OEMGN's exclusion because this rendered differentiated services unavailable. (Patel Report at ECF 220-23; Patel Reply at ECF 238-39.) But it is unclear whether OEMGN was unique in offering these services. (*See* Defs.' 56.1 Opp. at ¶ 82.) Dr. Patel has also not put forth a measurement of quality on a market-wide basis through the period in question, nor any other poof of overall quality degradation that might indicate the market had been subject to the exertion of market power. His equation of decline in product quality with an increase in price is questionable. Product quality and price are different traits and there is not necessarily an inverse causal relationship between them. An increase in a product's price cannot be shown by a reduction in the product's quality; it can be shown by measuring prices over time. No such analysis has been produced.

Nor has either party proven the existence or nonexistence of market power through shares. The combined market share of Mygrant and Interstate in the relevant product and geographic

markets, as calculated by Dr. Patel and discussed in the Savaria Report, never exceeded 40% during the conspiracy period. (Savaria Report at ECF 447.) It is not clear to the court that this percentage is high enough, on its own, to show a dominant market position. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 (1984) (finding that 30% share was too low to find market power on a different type of § 1 claim.) Dr. Patel also argues that determination of the extent of "Mygrant and Interstate's power as large national purchasers of aftermarket glass" is the proper way to assess its market dominance, as Defendants effectuated their anticompetitive scheme by leveraging their buying power of aftermarket auto glass. (Patel Reply at ECF 238.) Yet, he does not put forth any estimate of Mygrant and Interstate's share of national aftermarket glass purchases.[14] Dr. Patel notes that Dr. Savaria's estimate of Mygrant having a ▮▮▮ share and Interstate having a ▮▮▮ share is too low, due to Dr. Savaria's inclusion of sales outside of the United States in the calculation. (Patel Reply at ECF 243.) But he fails to put forward any calculation showing the correct shares.

In view of the uncertainty over market dominance, the court finds that this factor weighs in neither party's favor. *See, e.g., In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1070 (N.D. Cal. 2007).

c.    Procompetitive Effects

As to the third factor, there is no plausible argument that Defendants' conduct was efficiency-enhancing. Vertical agreements between suppliers and distributers, such as exclusive

---

[14] Dr. Patel's Table 6 does include a breakdown of Mygrant, Interstate, and OEMGN's glass purchases during the alleged conspiracy period. (*See* Patel Report at ECF 216.) This table shows Mygrant and Interstate's buying power vis-à-vis one another, as well as vis-à-vis OEMGN, but not relative to the entire market. The latter would be needed for a showing of market power.

distribution agreements, have been recognized as having the potential for procompetitive effects. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54-55 (1977). This is because by reducing *intrabrand* competition, vertical restrictions allow manufacturers to achieve certain efficiencies in the distribution of their products—thereby increasing *interbrand* competition. *Id.* The same cannot be said for horizontal compacts between wholesalers to jointly pressure suppliers not to sell to a competing wholesaler. *See generally Klor's*, 359 U.S. 207.

Defendants and their expert Dr. Savaria have not put forth any compelling procompetitive benefits for a purported wholesaler-led boycott of OEMGN. Dr. Savaria sets forth purported non-conspiratorial explanations for why suppliers refused to sell to OEMGN. (Savaria Report at ECF 455-56.) But these are not procompetitive benefits; they are independent business justifications. They pertain to reasons suppliers may not have sold to OEMGN rather than benefits to competition that could have arisen from suppliers not selling to OEMGN. Dr. Savaria also references the procompetitive benefits of manufacturers entering into vertical agreements with downstream sellers to control distribution channels. (Savaria Report at ECF 453.) But Plaintiffs' motion pertains to a horizontal agreement between wholesalers to jointly pressure upstream manufacturers to not sell to a competing wholesaler. The two situations are categorically different. Dr. Patel, for his part, argues that procompetitive benefits for such an arrangement do not exist. (Patel Reply at ECF 272.)

Seeing that Dr. Savaria has put forth no such benefits, the court finds Dr. Patel's argument persuasive. This factor therefore weighs strongly in favor of *per se* treatment.

d.   Conclusion

The first and third *Northwest Wholesale Stationers* factors are satisfied, though the second is not. As stated above, not all factors

must be met for *per se* treatment to apply. *Nw. Wholesale Stationers,* 472 U.S. at 295.

In *PharmacyChecker.com,* Judge Karas also considered whether the plaintiff had sufficiently alleged anticompetitive animus. 530 F. Supp. 3d at 346. This is a useful consideration, where, as here, the *Northwest Wholesale Stationers* factors do not uniformly suggest the same result. Plaintiffs have shown that Mygrant and Interstate bore an anticompetitive animus with regard to OEMGN. The court reaches this conclusion based on three showings: (1) the numerous statements by Mygrant and Interstate exhibiting their desire to run OEMGN out of business, (*see, e.g.,* Pls.' 56.1 St. at ¶¶ 93-96, 123-24, 140-41, 144-45, 186; Defs.' 56.1 Resp. at ¶¶ 93-96, 123-24, 140-41, 144-45, 186); (2) the fact that Mygrant and Interstate were direct horizontal competitors with OEMGN, (*see* Pls.' 56.1 St. at ¶¶ 85-87, 149; Defs.' 56.1 Resp. at ¶¶ 85-87, 149); and (3) indications that Mygrant and Interstate were jointly engaged in potentially anticompetitive conduct with respect to other competitors. (*See* Pls.' 56.1 St at ¶¶ 146-50; Defs.' 56.1 Resp. at ¶¶ 146-50.)

Given that two of the three *Northwest Wholesale Stationers* factors have been met, and anti-competitive animus has been found, the court finds that *per se* treatment applies. The lack of procompetitive rationale militates particularly heavily in favor of this conclusion. The court sees no procompetitive benefit in a naked boycott engineered jointly by two horizontal competitors. Such a scheme is not one where the likelihood of procompetitive effects outweighing anticompetitive effects is remote. *See Nw. Wholesale Stationers,* 472 U.S. at 294. Rather, the alleged horizontal restraint would be so likely to restrict competition without any offsetting efficiency gains that it should be analyzed as a *per se* violation of § 1.

2.   Antitrust Standing

Even under a *per se* theory of liability, a private antitrust plaintiff must also possess antitrust standing to pursue their claim. Defendants argue that Plaintiffs' failure to show antitrust standing here precludes a grant of summary judgment in their favor. (Defs' Opp. at 34.)

In the Second Circuit, a private plaintiff seeking to establish antitrust standing must show the following: (1) that they suffered antitrust injury and (2) that they are an efficient enforcer of the antitrust laws. *See Gatt Cmmcns, Inc. v. PMC Assocs., L.L.C.*, 711 F. 3d 68, 76 (2d Cir. 2013). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* A plaintiff must demonstrate antitrust injury whether the alleged violation is unreasonable *per se* or under the rule of reason. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

"We [the Second Circuit] employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury. First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive. Next, we identify the actual injury the plaintiff alleges. Finally, we compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *See Gatt*, 711 F. 3d at 76. Plausible allegations of a group boycott satisfy the first step of *Gatt*. *See IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 63 (2d Cir. 2019). Yet, despite Plaintiffs' contention, (Pls.' Reply at 12), such allegations do not alone

24

satisfy the obligation to show antitrust standing. *See Atlantic Richfield*, 495 U.S. at 344.

Antitrust injury does not require proof of harm to competition where, as in the case of a *per se* violation, such harm is not a prerequisite to recovery. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 775 (2d Cir. 2016). "To establish antitrust injury . . . Plaintiff must allege injury resulting from conduct with an anticompetitive tendency. No further showing of actual adverse effect in the marketplace is necessary." *PharmacyChecker.com*, 530 F. Supp. 3d at 331 (*citing Gelboim*, 823 F.3d at 776); *see also Pace Electronics, Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000). [15] Antitrust injury does not, however, result from conduct that either increased market competition or involved exclusion from a conspiracy or cartel. *See PharmacyChecker.com*, 530 F. Supp. 3d at 332 (citing *Brunswick*, 429 U.S. at 484; *Gatt*, 711 F.3d at 77.)

In addition to antitrust injury, a private plaintiff must also show that they are an efficient enforcer of the antitrust laws. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 408 (E.D.N.Y. 2020). This is because a party who states an antitrust injury may not be an efficient enforcer of the antitrust laws. *See Daniel*, 428 F.3d at 443. Courts weigh the following factors when determining whether a plaintiff is an efficient enforcer: "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of

---

[15] The Second Circuit previously noted that harm to competition was necessary to show antitrust injury, *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 294 (2d Cir. 2005), but it since-thereafter appeared to retract that statement, noting that "this dicta . . . cannot be reconciled with Supreme Court precedent." *Gelboim*, 823 F.3d at 777 n.16.

the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *Id.*

Though antitrust standing is typically an "inquiry resolved at the pleading stage" *Gelboim*, 823 F.3d at 770, courts in this circuit have also addressed it at summary judgment. *See, e.g., U.S. Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 284 (S.D.N.Y. 2015); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 415-16 (E.D.N.Y. 2013).

a.      Antitrust Injury

The first step in establishing antitrust injury under *Gatt* is assessing whether Plaintiffs adequately allege that Defendants have engaged in unlawful anticompetitive conduct, a low showing. *IQ Dental Supply*, 924 F.3d at 63. Here, *Gatt* step one is easily met, as the complained-of group boycott to cut off supply to OEMGN is clearly prohibited by the antitrust laws. *See Klor's*, 359 U.S. at 212; *IQ Dental Supply*, 924 F.3d at 63; *Rossi*, 156 F.3d at 464-65.

*Gatt* step two requires the court to isolate and identify OEMGN's actual injury or "the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct." 711 F.3d at 76. Plaintiffs argue that but for Defendants' concerted refusal to deal, OEMGN would have been a competitor in the aftermarket auto glass industry. (Pls.' Mot. at 1.) In short, OEMGN was the direct victim of Defendants' illegal scheme. The complained-of-conduct also did not increase competition, *see Brunswick*, 429 U.S. at 488, nor did it involve exclusion from a conspiracy or cartel. *See Gatt*, 711 F.3d at 77. In this context, the Plaintiffs' injury clearly flowed from Defendants' anticompetitive conduct. *See IQ Dental Supply*, 924 F.3d at 64; *Pharmacy-Checker.com*, 530 F. Supp. 3d at 330 (collecting cases).

At the final step, the court must compare the anticompetitive effect of the specific practice at issue to the actual injury the

26

plaintiff alleges. *Gatt*, 711 F.3d at 76. As discussed *supra*, there is evidence that OEMGN lacked adequate supply to enable it to compete in the aftermarket auto glass industry. A competitor being forced out of business due to insufficient supply is the expected anticompetitive effect from a group boycott. *See, e.g., Klor's*, 359 U.S. at 209 ("The concerted refusal to deal with Klor's [by suppliers] has seriously handicapped its ability to compete and has already caused it a great loss of profits, goodwill, reputation and prestige."). While Defendants have put forward non-conspiratorial explanations for OEMGN's lack of supply, (Defs.' Opp. at 25-34), these explanations do not show that that the complained-of injury differed from the injury that would result from an illicit group boycott. The explanations pertain to the means through which Plaintiffs' actual injury was achieved rather than the nature of the injury itself. Defendants do not suggest that the injury differed from one that would result from an anti-competitive boycott. This factor is therefore met.

Therefore, the Plaintiffs have sufficiently shown antitrust injury.[16]

b.      Efficient Enforcer

The court must next conduct the efficient enforcer portion of the antitrust standing inquiry. The Second Circuit's decision in *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, is instructive. 924 F.3d 57. This case involved allegations of three dental supply distributors engaging in a group boycott of an online portal that sold dental supplies. *Id.* at 60. The Second Circuit found that a distributor who sold products on the online portal was an efficient enforcer to pursue antitrust claims from defendants who pressured manufacturers not to supply that distributor. *Id.* at 68. "IQ claims that the Defendants pressured the manufacturers to stop

---

[16] Harm to competition need not be shown because Plaintiffs' § 1 claim receives *per se* treatment. *See Gelboim,* 823 F.3d at 775.

supplying IQ, frightened manufacturers away from supplying IQ in the first place, and otherwise disparaged IQ's business to its customers and potential customers." *Id.* The court found "that IQ [was] an efficient enforcer and thus ha[d] antitrust standing to proceed." *Id.*

This case is analogous to *IQ Dental Supply*. The injury to OEMGN from the alleged boycott is direct. In the antitrust context, directness means "close in the chain of causation." *Gatt*, 711 F.3d at 78. Because OEMGN was the target of Defendants' conduct and not a party harmed in an attenuated chain of causation, its injuries from the conduct are direct. The Plaintiffs are also sufficiently motivated, as they were the target and immediate victims of the direct boycott. *See IQ Dental*, 924 F.3d at 68. There are no better parties to pursue the case.

Turning to speculative injury, damages may be too speculative for antitrust standing purposes where they are indirect or where independent factors contribute to the alleged injury. *U.S. Airways, Inc.*, 105 F. Supp. 3d at 288. "[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779.[17] The instant inquiry turns on whether any damages calculation put forth by Plaintiffs must necessarily be so speculative that Plaintiffs cannot be allowed to pursue their claim. *See Gelboim*, 823 F.3d at 780. The Second Circuit found that this was not the case under similar circumstances in *IQ Dental Supply*. 924 F.3d at 68. The court reaches the same conclusion here. Damages can be calculated by

---

[17] The court will discuss overly speculative components of the proffered damages calculation when responding to Defendants' motion for summary adjudication.

projecting lost sales and lost profits but for the alleged misconduct.[18] This inquiry requires assumptions, but not "multiple layers of speculation" and is not of a "derivative nature." *IQ Dental Supply,* 924 F.3d at 67.[19]

Finally, there is no risk of duplicate recovery. Plaintiffs were the only competitor harmed by the alleged anticompetitive boycott. The injury is "specific" to them. *See IQ Dental Supply,* 924 F.3d at 68. There have also not been any suits brought by distributers or end-users of aftermarket auto glass to date. The likelihood of another party seeking redress from Defendants' alleged conduct is therefore low. For these reasons, the Plaintiffs are an efficient enforcer for the purposes of antitrust standing.

Accordingly, the court will not deny Plaintiffs' motion for summary judgment on its § 1 horizontal group boycott claim for want of antitrust standing.

### 3.   Existence of Agreement

Even under *per se* treatment, OEMGN must show that there is no genuine dispute of material fact as to the existence of an agreement between Defendants in order to be entitled to summary judgment on its Sherman Act § 1 claim. *See Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 771 (1984). "A [Sherman Act § 1] agreement may be found when the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful agreement." *Id.* (citing *Am Tobacco Co. v. United States,* 328 U.S. 781, 810 (1946)); *see also*

---

[18] That Tom Jr. could not state in his deposition which sales OEMGN lost on account of insufficient supply does not imply that that such sales *could not, in theory, be identified through further review.*

[19] Any damages estimate would also require "sufficient evidence to support a just and reasonable estimate of damages." *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1378 (2d Cir. 1988).

*Anderson News,* 680 F.3d at 183 ("In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice.").

To prove an antitrust conspiracy, "[a] plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir. 1987); *see also Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984). "[Direct] evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013).

"Even in the absence of direct smoking gun evidence, a horizontal agreement . . . may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* (citing *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir. 2001)). Conscious parallelism is "a common reaction of firms in a concentrated market that recognize their shared economic interest and their interdependence with respect to price and output decisions." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 553-54 (2007). It is not in itself unlawful. *Id.* But a showing of conscious parallelism in conjunction with certain additional circumstances, often referred to as "plus factors," can lead a factfinder to infer a conspiracy. *United States v. Apple,* 791 F.3d 290, 315 (2d Cir. 2015).

"Plus factors," or "[c]ircumstances that may raise an inference of conspiracy," include but are not limited to "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.; see also SourceOne Dental, Inc. v. Patterson*

*Companies, Inc.*, 310 F. Supp. 3d 346, 357 (E.D.N.Y. 2018). Plus factors alone may not necessarily lead to an inference of conspiracy—they could also lead to an inference of mere interdependent behavior. *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 340 F. Supp. 3d 285, 321 (S.D.N.Y. 2018).

Here there is no direct evidence of an agreement between Mygrant and Interstate. Plaintiffs have provided no writings or recordings of Defendants agreeing to jointly pressure sellers of aftermarket auto glass not to sell to OEMGN.[20] But, as discussed above, direct evidence is not required to find an agreement. (*Cf.* Defs.' Mot. at 18.) The court will therefore look to parallel conduct, plus factors, and references to concerted action to determine whether an agreement was made.[21]

---

[20] The meeting between Paul Anaya, William Weingart, and Angelo Marino is potentially circumstantial evidence of an agreement. In February 2014, Paul Anaya and William Weingart discussed a meeting with Angelo Marino set for March 4th, 2014 at the Vegas Diner in Brooklyn. (Pls.' 56.1 St. at ¶¶ 125-26; Defs.' 56.1 Resp. at ¶¶ 125-26.) Though the three cannot recall meeting on this date, Defendants admit that the meeting occurred at some point. (Defs.' 56.1 Resp. at ¶ 126.) Shortly after March 4, both Interstate and Mygrant contacted suppliers, including Benson and Vitro, about selling to OEMGN. (Pls.' 56.1 St. at ¶¶ 127, 135; Defs.' 56.1 Resp. at ¶¶ 127, 135.) If the meeting did take place on March 4, or shortly beforehand, the subsequent overtures to suppliers would create a strong inference that a scheme to organize a boycott of OEMGN was discussed at the meeting. In other words, there would be powerful circumstantial evidence of an agreement. However, there is a material dispute of fact as to when the meeting took place. (Pls.' 56.1 St. at ¶ 126; Defs.' 56.1 Resp at ¶ 126.) Given that the inculpatory nature of the meeting depends largely on its timing, the court cannot draw an inference that a boycott was discussed at the meeting without knowing more precisely when it took place. Though the meeting is undoubtedly suspicious, the court will not consider it to be convincing circumstantial evidence of an agreement due to this outstanding discrepancy about its timing.

[21] As it will explain in additional detail below, the court does not consider the references to concerted action to be direct evidence of an agreement.

### a.   Parallel Conduct

Defendants engaged in parallel conduct in the form of pressuring suppliers not to sell to OEMGN. In its most inculpatory form, this entailed Mygrant and Interstate contacting the *same* manufacturers of aftermarket auto glass regarding sales to OEMGN. These manufacturers include:[22]

- Carlex — Interstate's Patricia Walsh emailed Tony Arcadia, the Northeast Sales Manager of Carlex, in January 2014 to ask if Carlex was supplying OEMGN. (Pls.' 56.1 St. at ¶ 107; Defs.' 56.1 Resp. at ¶ 107; Pls.' 56.1 Reply at 13-14.)[23] Mygrant reached out to Carlex's Phil Gerhart with the same inquiry on January 24, 2014. (Pls.' 56.1 St. at ¶¶ 93-96; Defs.' 56.1 Resp. at ¶¶ 93-96.)

- ATI — In July 2015, Interstate's Patricia Walsh emailed an ATI representative to say that an ATI shipment was acceptable because it was not going to OEMGN. (Pls.' 56.1 St. at ¶ 195; Defs.' 56.1 Resp. at ¶ 195; Pls.' 56.1 Reply at 43.) In a 2016 call with Tom Jr., ATI's Doug Fassler stated that ATI refused to sell to OEMGN in part due to pressure. (Pls.' 56.1 St. at ¶ 199; Defs.' 56.1 Resp. at ¶ 199; Pls.' 56.1 Reply at 45.) When asked if Mygrant was the source of this

---

[22] The court notes that the below are not the only suppliers referenced in Plaintiffs' 56.1 Statement. (*See generally* Pls.' 56.1 St.) However, the statements that OEMGN uses to support its claims with regard to the other suppliers may be hearsay—they are out-of-court assertions made by non-Defendants.

[23] Defendants object to consideration of audio recordings without provision of a certified transcript. (*See* Defs.' 56.1 Resp. at ¶ 107.) But an audio recording is admissible even where it is unintelligible in certain portions. *See United States v. Arango-Correa,* 851 F.3d 54, 58-59 (1988). Submission of a certified transcript is therefore not required for the recording to be admissible.

pressure, Doug Fassler responded that he would rather not say. (Pls.' 56.1 St. at ¶ 199; Defs.' 56.1 Resp. at ¶ 199; Pls.' 56.1 Reply at 45.)[24]

Given the many suppliers of aftermarket auto glass, the fact that Mygrant and Interstate reached out to the *same* suppliers with the *same* directive—do not to sell to OEMGN—is suspicious parallelism.

Both Defendants also contacted other suppliers about selling to OEMGN. This included Mygrant contacting Xinyi in 2014, (Pls.' 56. 1 St. at ¶ 108; Defs.' 56.1 Resp. at ¶ 108), Benson throughout multiple years,[25] (Pls.' 56.1 St. at ¶¶ 179, 184-86; Defs.' 56.1 Resp. at ¶¶ 179, 184-86; Pls.' 56.1 Reply at 39-40), and AGO in 2014. (Pls.' 56. 1 St. at ¶ 225; Defs.' 56.1 Resp. at ¶ 225; Pls.' 56.1 Reply at 52.) Mygrant also discussed its concerns about OEMGN entering the market with Sika. (Pls.' 56.1 St. at ¶¶ 111-12; Defs.' 56.1 Resp. at ¶¶ 111-12.)[26] Interstate contacted Vitro in 2014, (Pls.' 56.1 St. at ¶ 135; Defs.' 56.1 Resp. at ¶ 135; Pls.' 56.1 Reply at 25-26), and PGW that same year. (Pls.' 56. 1 St. at ¶¶ 141, 247; Defs.' 56.1 Resp. at ¶¶ 141, 247.) ATI refused to supply C-Auto with glass that would ultimately be sold to OEMGN because an order "going to Brooklyn . . . cause[s] more trouble than it is worth." (Pls.' 56. 1 St. at ¶ 234; Defs.' 56.1 Resp.

---

[24] Doug Fassler initially stated in his deposition that the pressure he was referring to in this conversation was internal pressure related to ███████ ███████ (Ex. 9 to MacKay Decl. (Dkt. 187-5) at ECF 309.) A few moments later, however, he stated that he did not "recall the conversation, period." (*Id.* at ECF 310.)

[25] Specifically, Mygrant raised the issue of Benson sales to National Glass Brokers, who in turn was selling to OEMGN. (Pls.' 56.1 St. at ¶¶ 127, 131, 179, 185-86; Defs.' 56.1 St. at ¶¶ 127, 131, 179, 185-86.)

[26] Internal Mygrant emails also discuss OEMGN trying to obtain glass from AGD's Kip Wiley and C-Auto. (Pls.' 56.1 St. at ¶¶ 211-12; Defs.' 56.1 Resp. at ¶¶ 211-12; Pls.' 56.1 Reply at 6.) These emails show, at a minimum, that Mygrant was aware that OEMGN was attempting to purchase glass from these entities.

at ¶ 234.) Defendants' communications with different suppliers represents yet another form of parallel conduct.

That Defendants engaged in the exact same conduct around the same time does not definitively prove that an agreement was in place. In fact, Defendants assert that many of these communications were for innocent, non-conspiratorial purposes. (*See, e.g.,* Defs.' 56.1 Resp. at ¶¶ 92-93, 108, 135.) But the Defendants' actions undoubtedly raise the specter of agreement.

b.    Plus Factors

The facts at hand provide evidence that some, but importantly not all, of the plus factors militate toward a finding that an agreement existed.

The first possible plus factor is common motive to conspire. *See Apple,* 791 F.3d at 315. Plaintiffs' expert Dr. Patel argues that Mygrant and Interstate had an incentive to exercise their buying power to impose a supplier boycott against differentiated competitors, such as OEMGN, because this would lead to increased sales and profits. (Patel Reply at ECF 249.) Such a boycott would come at little cost, Dr. Patel argues, because suppliers were unlikely to abandon Mygrant and Interstate due to their large purchasing volumes. (*Id.* at ECF 241-42.)[27] Dr. Savaria, on the

---

[27] Plaintiffs also cite communications between Mygrant and Interstate suggesting a desire to run OEMGN out of business as further evidence supporting this factor. (Pls.' Opp. (Dkt. 186) at 31-32.) But, the "common motive to conspire" plus factor has tended to focus on economic incentives rather than communications suggesting a conspiracy. *See SourceOne Dental,* 310 F. Supp. 3d at 362 ("Defendants' secure positions in the market and the relative ease of excluding others make the allegations of collusive behavior all the more plausible."); *Anderson News,* 899 F.3d at 112 ("[W]e note that the defendants had an unlikely motive to conspire, given our conclusion that the alleged conspiracy is economically implausible.") Thus, the communications Plaintiffs cite would be more suggestive of the "high level of interfirm communications" plus factor.

other hand, argues that the risk of losing suppliers would disincentivize Mygrant and Interstate from organizing a horizontal boycott of OEMGN through threats. (Savaria Report at ECF 450.) The parties also debate whether ATI had an incentive to join the conspiracy due to threats of losing Mygrant's business. (Pls.' Opp. at 32; Defs.' Reply (Dkt. 191) at 23.)

Defendants do not, however, make any specific assertions about the structure of the aftermarket auto glass industry and how it leads to a common motive to conspire. *Cf. SourceOne Dental*, 310 F. Supp. 3d at 361-62 ("All of the above evidence is further bolstered by the structure of the dental-supplies market, which gave defendants a common motive to conspire . . . the distribution market is concentrated . . . Defendants' market positions are protected by significant barriers to entry and expansion, including the substantial economies of scale necessary for distribution . . . high fixed costs, and access to the most popular brands[.]).[28] Market participants in most industries would realize greater profits if differentiated competitors went out of business. But this does not mean that an incentive to conspire exists in most industries. Such a conclusion would render this plus factor meaningless. Without an explanation as to why structural factors in the aftermarket auto glass industry encourage conspiracy, it is unclear why conspiracy is more likely in this industry than in any other.[29] Plaintiffs' expert has not put forth any such explanation. Accordingly, the court cannot conclude that this plus factor suggests the existence of conspiracy.

---

[28] Dr. Patel alleges that anticompetitive actions by incumbent firms can create barriers to entry, as was the case here. (Patel Reply at ECF 236-37.) But anticompetitive actions are not structural features of the aftermarket auto glass market.

[29] Such factors could include the number of market participants, barriers to entry, product differentiation, etc. Dr. Patel does discuss these factors, (*see, e.g.,* Patel Reply at 234-37), but not in the context of motive to conspire.

Next, was Defendants' conduct in their individual self-interest? Mygrant and Interstate are alleged to have executed their boycott of OEMGN by pressuring suppliers not to sell aftermarket auto glass to Tom Jr. But firms have an individual self-interest to ensure continued, adequate flow of inventory from suppliers. This is especially true in the aftermarket auto glass industry, where there are periodic glass shortages. (Defs.' 56.1 St. at ¶ 85; Pls.' 56.1 Resp. at ¶ 85.) And pressuring suppliers not to sell to Tom Jr. could have helped ensure continued adequate flow of inventory to Defendants. It was therefore within Mygrant and Interstate's unilateral self-interest to shore up glass supply at the lowest price from suppliers.

The alleged conspiracy did involve Mygrant and Interstate threatening to stop purchasing from suppliers that sold to OEMGN. Following through on these threats would likely have been harmful for Mygrant and Interstate, given the importance of supply in the aftermarket glass industry. Yet Mygrant and Interstate never went through with their threats. There is also no evidence that they would have done so had a supplier insisted on selling to OEMGN. Their actions were therefore not against their own unilateral self-interest.

Whether ATI's actions were against its self-interest is a closer call. ATI was primarily a manufacturer of aftermarket auto glass that earned revenue from sales to wholesalers. (Pls.' 56.1 St. at ¶¶ 40-41; Defs.' 56.1 Resp. at ¶¶ 40-41.) It therefore had an incentive to sell glass to wholesalers. Nonetheless, Defendants have presented a reasonable case that ATI, as a matter of course, took steps to limit the number of wholesalers it did business with in a given market. (Defs.' 56.1 St. at ¶¶ 24-28; Pls.' 56.1 Resp. at ¶¶ 24-28.) Courts have long recognized the incentives of upstream suppliers to limit downstream distribution of their products. *See GTE Sylvania*, 433 U.S. at 54-56 ("Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve

certain efficiencies in the distribution of his products."). In this context, the court cannot conclude with certainty that refusing to sell to OEMGN was against ATI's self-interest.

Finally, the court will assess whether there were substantial communications between Mygrant and Interstate. There was, at some point, a meeting between Paul Anaya, William Weingart, and Angelo Marino. (Pls.' 56.1 St. at ¶ 126; Defs.' 56.1 Resp. at ¶ 126.) Emails sent by Paul Anaya also indicate repeated communication with Angelo Marino. (Pls.' 56.1 St. at ¶¶ 139-41; Defs.' 56.1 Resp. at ¶¶ 139-41; Pls.' 56.1 Reply at 6.) The parties also communicated about Mygrant putting Interstate on "Open Account Terms," Mygrant sales to Interstate, the competitive threat posed by another auto glass wholesaler, the possibility that Mygrant would open a warehouse on Long Island, and other topics. (See Pls.' 56.1 St. at ¶¶ 137-38, 146-53; Defs.' 56.1 Resp. at ¶¶ 137-38, 146-53.) The two had legitimate reasons to communicate because Mygrant sold glass to Intestate. (Defs.' 56.1 Resp. at ¶ 85; Pls.' 56.1 Reply at 6.) Yet, as demonstrated by Interstate's concern that Mygrant would open a warehouse on Long Island, the two still viewed each other as competitors in some capacity. (Pls.' 56.1 St. at ¶ 149; Defs.' 56.1 Resp. at ¶ 149.) Defendants even agree that "Mygrant and Interstate are competitors." (Pls.' 56.1 Resp. at ¶ 85; Defs.' 56.1 Resp. at ¶ 85.) It therefore cannot be assumed that all communications between Mygrant and Interstate were pursuant to a customer-supplier relationship.[30] Accordingly, this plus factor suggests the existence of an agreement.

Therefore, some but not all, plus factors suggest the existence of an agreement.

---

[30] The communications between Mygrant and ATI are more likely to be pursuant to such a relationship. (See Pls.' 56.1 St. at ¶ 40; Defs.' 56.1 Resp. at ¶ 40; see also Defs.' Reply at 24.)

c.   References to Concerted Action

There are also references to concerted effort between Mygrant and Interstate in the record. The most glaring is the November 12, 2014 email from Mygrant's William Weingart to Mygrant's Paul Anaya stating that "Angelo [Marino] said Brooklyn Wholesale is buying from Pilkin[g]ton under the name oem glass network, **he was hoping you could make a phone call to pilk to stop them from selling them**, he said he called pgw and put a stop to them selling Tom." (Pls.' 56.1 St. at ¶ 141; Defs.' 56.1 Resp. at ¶ 141.)[31] The email alludes to a specific coordinated action between Mygrant and Interstate—reaching out to "pilk" to stop sales to OEMGN. It also more broadly implies that Mygrant and Interstate had reached some sort of common understanding, or concerted effort, in their dealings with OEMGN. Otherwise such an email would not likely have been sent, let alone in such a casual cadence.

Other emails make similar references. In a February 2014 email to William Weingart, Paul Anaya, in discussing competing with Tom Jr., stated "[o]r have Angelo take care of him" along with the following graphic:



---

[31] Though Paul Anaya, William Weingart, and Angelo Marino all struggled to recall the events around this email in deposition, Defendants have not put forth any alternative explanation for it. (Defs.' 56.1 Resp. at ¶ 141.)

(Pls.' 56.1 St. at ¶ 139; Defs.' 56.1 Resp. at ¶ 139; Pls.' 56.1 Reply at 6.) Similarly, in a June 5, 2014 email, Paul Anaya emailed Mygrant employees saying that he heard from Angelo Marino that Brooklyn Wholesale was having trouble sourcing glass from anyone, before encouraging the employees to "keep[ ] the pressure on." (Pls.' 56.1 St. at ¶ 140; Defs.' 56.1 Resp. at ¶ 140.) An internal Mygrant email chain a few days later referenced **"want[ing] to run Tommy out of Town"** when discussing a quote for Interstate's container business. (Pls.' 56.1 St. at ¶ 144; Defs.' 56.1 Resp. at ¶ 144.) A Mygrant employee responded "Angelo will jump all over this if we present it in a man[ne]r we are doing it to leverage XYG [Xinyi] and run Tommy out. Angelo hates Tommy." (Pls.' 56.1 St. at ¶ 145; Defs.' 56.1 Resp. at ¶ 145.) These emails suggest, at a minimum, that Interstate and Mygrant were in communication on the state of OEMGN's business and on competition between the firms. They also further support an inference that Mygrant and Interstate were working together to take down OEMGN.

Though highly suggestive, these communications are not direct evidence of an agreement because they do not memorialize a joint effort to organize a boycott of OEMGN. Defendants further attempt to minimize these messages by arguing that they were jokes or pertained to non-conspiratorial business initiatives. (*See, e.g.,* Defs.' 56.1 Resp. at 139, 141-42.) In the court's view, however, these references implicate some coordinated effort between Mygrant and Interstate.

### d.    Conclusion

Defendants certainly engaged in parallel conduct by pressuring suppliers not to sell to OEMGN. Certain plus factors and references to concerted action strengthen the inference of conspiracy from this parallelism. Yet the possibility of a reasonable inference that Defendants' overtures to suppliers were taken for

non-conspiratorial reasons pursuant to their unilateral self-interest remains. (*See* Defs.' Opp. at 23-32.) Defendants have pointed to testimony in the record suggesting as much. (*See, e.g.,* Defs.' 56.1 Resp. at ¶¶ 92-96, 127, 135.) In this context, a reasonable jury could—but would not necessarily—find for Defendant as to the existence of an agreement. *See Matsushita*, 475 U.S. at 586. A genuine dispute of material fact exists.

The court reaches this conclusion although it is mindful that "in the context of antitrust cases . . . summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo.,* 315 F.3d at 104; *see also In re Publ'n Paper*, 690 F.3d at 61. Here there are numerous evidentiary issues that complicate finding the existence of an agreement at summary judgment. The court can only consider admissible evidence in weighing summary judgment. *See Ehrens*, 385 F.3d at 235. A large portion of the materials that OEMGN has submitted in support of its motion for summary judgment are out-of-court statements made by non-parties. It is unclear, if not doubtful, that such statements are admissible. Defendants have called attention to the potential inadmissibility of these statements, *see generally* Defs.' 56.1 Resp., but there has not been additional briefing on the topic. The parties have also not yet submitted motions *in limine* regarding expert reports. The court has conservatively endeavored to rely only on admissible evidence in deciding this motion. Additional briefing on evidentiary issues in the run-up to trial would, however, clarify which statements can and cannot be considered in weighing the existence of an agreement. For these reasons, the court believes that the remaining factual questions are better suited for adjudication at trial.

The court therefore cannot conclude that OEMGN has met its summary judgment burden with respect to showing the existence of an agreement.[32]

### 4. Conclusion

For the reasons stated above, the court DENIES Plaintiffs' motion for summary judgment on its § 1 horizontal group boycott claim. Plaintiffs do, however, possess antitrust standing to pursue their claim on a *per se* theory of liability.

## B. Defendants Motion for Summary Judgment or Summary Adjudication

Defendants also move for summary judgment or summary adjudication. They first ask the court to dismiss Plaintiffs' claims for damages from two potential warehouses in Queens and New Jersey, arguing that OEMGN lacks standing to obtain recovery from these locations. (Defs.' Mot. at 18.) Defendants also ask for summary judgment against Plaintiffs on their § 1 claim more broadly for failure to present a genuine issue of material fact as to the existence of an unlawful conspiracy. *Id.*

For the foregoing reasons, the court DENIES Defendants' motion in both respects.

### 1. Standing For Damages From Unopened Warehouses

Defendants first seek summary judgment on OEMGN's claims for damages from its proposed warehouses in Queens and New Jersey. They argue that OEMGN lacks both Article III and antitrust standing to recover damages from these locations and

---

[32] The court notes that the Plaintiffs have laid out facts that strongly implicate a horizontal boycott of OEMGN. While these are not sufficient to meet Plaintiffs' burden at summary judgment, particularly in light of the outstanding evidentiary issues, the court notes the strength of the facts supporting Plaintiffs' claim.

that the court should summarily adjudicate these claims in Defendants' favor. (Defs.' Mot. at 18-20; Defs.' Reply at 3.)

a.     Article III Standing

The court is not convinced that the issue of damages from the potential warehouses in Queens and New Jersey raises Article III standing issues.

Constitutional standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). To qualify for Article III standing, the plaintiff must have suffered an injury in fact, there must be a causal connection between the complained-of conduct and the plaintiff's injury, and the injury must be redressable through a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The asserted injury must be "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Id.* "[I]n evaluating whether the alleged injury is concrete and particularized, we . . . confirm that the plaintiff has a personal stake in the controversy" and thus "avoid having the federal courts serve as merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003).

While Article III standing must be shown for each distinct form of relief sought, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (requiring separate showings of standing for compensatory and injunctive relief), there is no requirement that a plaintiff show Article III standing for each revenue stream contributing to a compensatory damage sum. Such a requirement would not further the aims of Article III standing. The doctrine aims to safeguard the separation of powers by ensuring that federal courts neither "adjudicate hypothetical or abstract disputes" nor act as "a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203

(2021). A plaintiff that has shown injury-in-fact in the form of a particularized monetary loss does not present a merely hypothetical dispute. *Id.* at 2204.[33] This plaintiff has made a threshold showing of injury such that inviting a federal court to opine does not threaten separation of powers. So long as this harm is also "fairly traceable" to the challenged conduct and "redressable" by a favorable decision, Article III standing is met. The inquiry ends there. Subsequently pruning off specific sums from a damages estimate would not further goal of avoiding advisory opinions, *see TransUnion*, 141 S. Ct. at 2203, because the dispute before the court has already been shown to be live. This would be true even where certain sums claimed by the plaintiff were speculative.

Defendants have not offered persuasive legal authority to the contrary. They argue, relying on *Fido's Fences, Inc. v. Radio Systems Corp.*, 999 F. Supp. 2d 442 (E.D.N.Y. 2014), that a party's preparedness to enter a market—whether it is "ready, willing, and able" to do so—bears on Article III standing. (Defs. Mot. at 19, 21-22.) *Fido's Fences* does discuss the issue of preparedness to enter a market in the context of Article III standing. *Fido's Fences*, 999 F. Supp. 2d at 449-50. But the cases it cites pertain to antitrust standing, which is distinct from Article III standing. *Id.* (citing *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 611 F. Supp. 379, 385 (N.D.N.Y. 1985); *Reamco, Inc. v. Allegheny Airlines*, 496 F. Supp. 546, 553-54 (S.D.N.Y. 1980); *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 567 (S.D.N.Y. 2007)). Moreover, Judge Katzmann cited *Fido's Fences* and *Indium* in a concurrence in *Biocad JSC v. F. Hoffmann-Lar Roche* when discussing the "indicia of preparedness" in the context of antitrust

---

[33] A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016).

standing. 942 F.3d 88, 103 (2d Cir. 2019).[34] At least one Judge on the Second Circuit has thus read *Fido's Fences* differently than Defendants ask the court to here. Defendants also cite *In re Aluminum Warehousing Antitrust Litigation*, 833 F.3d 151 (2d Cir. 2016) and *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223 (3d Cir. 2013) to support their Article III argument. (Defs.' Mot. at 20.) The relevant discussions in both cases pertain to antitrust standing. *In re Aluminum Warehousing*, 833 F.3d at 158; *Ethypharm*, 707 F.3d at 233. The same goes for *American Banana Co v. United Fruit Co.*, 166 F. 261 (2d Cir. 1908), which, contrary to Defendants' portrayal of the case, (*id.* at 22), has historically been read as pertaining to antitrust standing. *See Biocad JSC*, 942 F.2d 102-03 (Katzmann, C.J., concurring).

The court therefore declines to preclude recovery from the proposed warehouses in Queens and New Jersey on the basis of Article III standing.

### b.  Antitrust Standing

Defendants have also not shown that OEMGN is barred from recovering these damages as a matter of antitrust standing.

Even if Defendants had properly framed their argument on preparedness for market entry as a matter of antitrust standing, it would still fail. The preparedness inquiry has been applied to prospective market entrants that have no sales in the market at issue. *See, e.g., Indium*, 611 F. Supp. at 385 ("[The plaintiff] claims that it . . . would have manufactured [the product at issue] if not for the defendant's patents."); *Biocad JSC v. F. Hoffman-La Roche Ltd.*, 2022 WL 268102, at *4 (S.D.N.Y. Jan. 28, 2022) ("Here, Defendants assert that Biocad, which had no sales in the United States, failed to allege that it was prepared to enter the U.S. pharmaceutical market."); *Fido's Fences*, 999 F. Supp. 2d at

---

[34] The majority opinion in *Biocad JSC* did not reference *Fido's Fences* or *Indium*. *See generally* 942 F.3d 88.

447 ("Fido's also intends to launch, in the Spring of 2012, its own receivers and collars to compete with RSC and Invisible Fence, but it has been hindered in its efforts to compete by defendants' anticompetitive conduct.").

OEMGN, however, had sales in both Queens and New Jersey during the period in question and cannot be characterized as a market entrant in either. (Ex. 40 to MacKay Decl. ("Rowe Report") (Dkt. 185-9) at ECF 286.)[35] There is no question that Queens was part of the relevant geographic market. (*See* Pls.' 56.1 St. at ¶ 251; Defs.' 56.1 Resp. at ¶ 251.) Opening a warehouse in Queens would constitute an expansion of OEMGN's operations in a constituent region of the relevant market rather than entry into a new market. OEMGN also cannot be characterized as a market entrant in New Jersey because it sold to customers in the state throughout its time in operation. (Rowe Report at ECF 286.) Construction of a warehouse in New Jersey would have undoubtedly increased OEMGN's presence and capacity in the state. Yet, there was nothing preventing OEMGN from selling there prior to constructing a warehouse—the lack of warehouse was not a barrier to entry.[36] *Cf. Fido's Fences*, 999 F. Supp. 2d at 451-52. Accordingly, Plaintiffs' preparedness for market entry argument is inapplicable to the facts before the court.

In the alternative, Defendants argue that OEMGN cannot demonstrate antitrust injury for its proposed warehouses in Queens and New Jersey because there was no harm to competition in these markets. (Defs.' Mot. at 26.) But a showing of harm

---

[35] Middlesex and Oceans County, referenced in the Rowe Report, are in New Jersey.

[36] There may have been more vigorous competition in New Jersey, but this did not constitute a barrier to entry in the state. (Defs.' 56.1 St. at ¶ 99; Pls.' 56.1 Resp. at ¶ 99.)

to competition is not needed to establish antitrust injury on Plaintiffs' horizontal boycott claims because the alleged conduct receives *per se* treatment. *See Gelboim*, 823 F.3d at 775; *PharmacyChecker.com*, 530 F. Supp. 3d at 331. As the court established *supra*, Plaintiffs possess antitrust standing to pursue their claims in the relevant product and geographic markets without making such a showing. Queens is a part of this relevant market. Antitrust standing has been established in regard to Queens.

The separate question remains, however, of whether a private antitrust plaintiff can, as a matter of antitrust standing, recover for harms suffered outside of the relevant geographic market, as OEMGN seeks to do here in regard to the New Jersey warehouse. (*See* Defs.' Mot. at 20.) *SC Innovations, Inc. v. Uber Technologies, Inc.* is helpful to this point. 18-CV-7440 (JCS), 2021 WL 2302728, at *1 (N.D. Cal. May 11, 2021). In *SC Innovations* the court assessed whether a plaintiff could obtain discovery related to damages outside the relevant product market. *Id.* Magistrate Judge Spero ordered limited discovery on the basis that the plaintiff "might be able to recover damages for lost profits outside the relevant market." *Id.*[37] *See also Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 814 (3d Cir. 1984) ("[N]or did the district court err in permitting the jury to consider damages for lost profits on projected sales outside of the geographic and product markets stipulated for liability purposes."). Magistrate Judge Spero also noted the distinction between "antitrust injury—a necessary element to establish liability" and "the scope of permissible damages once liability is shown." *SC Innovations*, 2021 WL 2302728 at *1.

---

[37] Though *SC Innovations* involved a discovery dispute where the permissible scope of the inquiry may have been broader than the question here, (*see* Defs.' Reply at 4), its legal analysis of out-of-market antitrust injury remains helpful.

The court adopts this approach. "Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury." *In re Aluminum Warehousing*, 833 F.3d at 158. OEMGN was such a participant. It competed directly with Mygrant and Interstate in the aftermarket auto glass market in the New York Metropolitan Area and suffered antitrust injury due to anticompetitive conduct in this market. It therefore satisfied the threshold inquiry for antitrust standing, as needed to pursue damages. *Gelboim*, 823 F.3d at 770. That some damages may have been incurred outside the relevant market does not change this conclusion.

Nor is out-of-market recovery inconsistent with the concerns underlying antitrust injury. The Supreme Court has characterized antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flow[] from that which makes defendants' acts unlawful . . . [i]t should, in short, be the type of loss that the claimed violations would be likely to cause." *Brunswick*, 429 U.S. at 489. This injury arises when a party is adversely affected by the "an *anticompetitive* aspect of the defendant's conduct." *Atlantic Richfield*, 495 U.S. at 339 (emphasis in original). It is by no means a given that the effects of a defendant's anticompetitive actions stop at the borders of the relevant geographic market. A party harmed inside the relevant market may also operate elsewhere and the anticompetitive effects inflicted in the relevant market may impact the party's operations outside of that market. Consider, for example, a firm that operates in two cities and is the target of an anticompetitive conspiracy in the first city. As a result of the conspiracy, the firm must substantially reduce its orders from a national supplier and loses its volume discount from the supplier. The cost of the firm's inputs then increases nationwide, and it must increase prices in the second city to recoup costs. Competitors in the second city are then able to undercut the firm on prices and the firm loses profits there. The harm to

the firm's business in the second city is a result of the anticompetitive effects inflicted in the first city. The conspiracy has impacted the firm's ability to take advantage of scale effects nationwide. Limiting recovery to the relevant geographic market would prevent such a party from being made whole while in no way filtering for proper antitrust plaintiffs.

Accordingly, the court will not bar recovery from the proposed warehouses in Queens and New Jersey for want of antitrust standing.[38]

### c.    Damages Estimate

A better way to police overly speculative damage estimates is to require OEMGN to prove loss causation from its prospective Queens and New Jersey warehouses in a sufficiently definite

---

[38] The Amended Complaint refers to a Sherman Act claim under the rule of reason and a Donnelly Act claim under *per se* or rule of reason standards. (*See* Am. Compl. (Dkt. 99) at 23-25.) The court has not addressed antitrust standing on these alternative claims, and has only done so in regard to the Sherman Act *per se* horizontal boycott claim. In discussing antitrust standing to pursue damages from the two unopened warehouses, Defendants' briefing states "Plaintiffs allege liability under a *per se* and rule of reason standard in their Amended Complaint, and Defendants have moved on both." (Defs.' Reply at 12.) Defendants assert that harm to competition must be shown for there to be antitrust standing on these claims. (Defs.' Reply at 12.)

To the extent that the standing analysis differs for the alternate claims due to the need to show harm to competition, Defendants would need to show a lack of genuine dispute as to the existence of harm to competition to be entitled to summary adjudication on this basis. But this is belied by the record. Plaintiffs have created a genuine dispute by proffering evidence that the alleged conspiracy harmed competition. (*See* Patel Report at ECF 220-22.) Defendants would thus not be entitled to summary adjudication on damages from the two unopened warehouses even under Plaintiffs' alternative theories of recovery.

manner. Any damage estimate put forth by OEMGN would require "sufficient evidence to support a just and reasonable estimate of damages." *U.S. Football League*, 842 F.2d at 1378. "Whatever latitude is afforded antitrust plaintiffs as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to some degree to unlawful acts. That latitude is thus circumscribed by the need for proof of causation." *Id.*; *see also In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 217 (S.D.N.Y. 2018) ("Plaintiffs must demonstrate that [their expert's] methodology identifies only damages that result from Defendants' wrong — *i.e.*, it must isolate damages that inhere from a valid theory of antitrust impact from those that do not."). If OEMGN is unable to prove at trial that it would have opened the Queens and New Jersey warehouses but for Defendants' alleged misconduct, or provide a reasonable estimate of damages stemming thereof, then damages for those warehouses will not be awarded.

### d.    Conclusion

Accordingly, the court DENIES Defendants' motion for summary adjudication with regard to OEMGN's damages from planned warehouses in Queens and New Jersey. To obtain recovery, however, OEMGN will have to prove loss causation and provide just and reasonable damages estimates from these warehouses.

### 2.    Defendants' Liability for Horizontal Boycott

Defendants also move for summary judgment on OEMGN's § 1 claim on the grounds that OEMGN has not presented evidence showing the existence of an illegal agreement. (Defs.' Mot. at 29-30.) They argue that each of the Defendants had an independent, plausible, and justifiable reason for not "choosing to prioritize business with Plaintiffs" and that OEMGN has "fail[ed] to demonstrate any parallel conduct or plus factor." (*Id.* at 31.)

The court disagrees. As discussed *supra*, Plaintiffs have produced evidence showing parallel conduct among the Defendants. Mygrant and Interstate both pressured suppliers not to sell to OEMGN around the same time. In some instances, this entailed the *exact same* suppliers. ATI similarly pressured at least one supplier not to sell to OEMGN. There are also multiple emails suggesting that Defendants were in communication about which suppliers were selling to OEMGN. One of these emails strongly implies the existence of a concerted effort between Mygrant and Interstate to organize a supplier boycott of OEMGN. Consideration of plus factors also does, to some extent, suggest the existence of conspiracy.

Taken as a whole, the evidence presented by Plaintiff "tends to exclude the possibility that the [defendants] were acting independently." *Anderson News*, 899 F.3d at 98 (citing *Matsushita*, 475 U.S. at 588.)[39] The court reaches this conclusion, in part, because of the lack of procompetitive explanation for Defendants' conduct. The range of permissible inferences to be drawn from proffered evidence depends on the plausibility of the plaintiff's theory. *See Matsushita*, 475 U.S. at 588. Where, as here, the challenged activity could not reasonably be perceived as procompetitive, *see supra* Section III.A.1.c., broader inferences are permitted. *In re Publ'n Paper*, 690 F.3d at 63 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004)).[40]

Defendants' briefing offers lengthy non-conspiratorial explanations for their conduct. (*See* Defs.' Mot. at 30-35; *cf.* Pls.' Opp.

---

[39] As discussed *supra*, the evidence does not, however, sufficiently establish the existence of an agreement for the purposes of Plaintiff's motion for summary judgment.

[40] Though the court did not find that Defendants had an incentive to conspire, *see supra* Section III.A.3.c., it did not conclude that a conspiracy would have been economically irrational. *See In re Publ'n Paper*, 690 F.3d at 63.

at 24-27.) To survive summary judgment, a plaintiff is not required to "disprove all nonconspiratorial explanations for the defendant's conduct." *In re Publ'n Paper*, 690 F.3d at 63 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 14.03(b), at 14-25 (4th ed. 2011) (Areeda & Hovenkamp, *Fundamentals*).) Rather, the evidence need only be sufficient "to allow a reasonable fact finder to infer the conspiratorial explanation is more likely than not." *Id.* OEMGN has made such a showing here.

For these reasons, Defendants' motion for summary judgment on OEMGN's § 1 claim is DENIED.

## IV. CONCLUSION

Accordingly Plaintiffs' motion for summary judgment is DENIED. Defendants' motion for summary judgment or, in the alternative, summary adjudication, is also DENIED. OEMGN can proceed on its § 1 horizontal boycott claim against Defendants on a *per se* theory of liability.

SO ORDERED.

Dated:     Brooklyn, New York
           March 10, 2023

                              s/Nicholas G. Garaufis
                              NICHOLAS G. GARAUFIS
                              United States District Judge

51